**PRACTICAL CONCEPTS, INC., Plaintiff,**

v.

**The REPUBLIC OF BOLIVIA, Defendant.**

**Civ. A. No. 82–3706.**

United States District Court, District of Columbia.

July 11, 1985.

Neil I. Levy, Melrod, Redman & Gartlan, Washington, D.C., for plaintiff.

William R. Joyce, Jr., Thomas T.F. Huang, Vance, Joyce, Carbaugh & Huang, Washington, D.C., for defendant.

L. Marc Zell, Topf, Zell, Kolodny & Goldstein, Bethesda, Md., for garnishee.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

On July 28, 1983, this Court entered a default judgment in favor of the plaintiff, Practical Concepts, Inc. ("PCI"), against the Republic of Bolivia ("Bolivia") in the amount of $1,695,601.00. After a statutorily prescribed waiting period, PCI began proceedings to execute the judgment and obtained attachments directed to two local banks against accounts titled in the name of the Bolivian Embassy. Shortly thereafter, Bolivia made its first appearance and filed a motion to vacate the default judgment, arguing it is void because the Court lacked jurisdiction to render it. In addition to Bolivia's motion, there are presently before the Court PCI's motions for judgment of condemnation against the garnishee National Bank of Washington, and for discovery sanctions against Corporacion Min-era de Bolivia, an intervenor claiming ownership of one of the garnished accounts.

For the reasons set forth below, the Court vacates the default judgment and dismisses the suit for lack of personal and subject matter jurisdiction. Consequently, the writs of attachment are quashed, and the motion for discovery sanctions denied.

## FACTUAL BACKGROUND

This litigation arises from Bolivia's alleged breach of a contract for the provision of consulting services by PCI. The contract was executed in August 1979 by the Bolivian Ministry of Planning and Coordination ("MPC"), but was mainly funded by a $2.5 million grant from the United States Agency for International Development ("AID"). The purpose of both the AID grant and the PCI contract was to develop a comprehensive plan for Bolivian rural development.

PCI's services under the contract were to be rendered by two distinct teams of advisors. PCI's U.S.-based staff retained overall control and were responsible for broadscale research, planning and supervision of the project. Other aspects of the project, such as direct technical assistance and data gathering, were to be performed by personnel on location in Bolivia for periods of assignment ranging from one to three years (referred to in the contract and hereinafter as the "field team" or "expatriate staff").

In addition to their consulting fee and fixed costs, the contract entitled PCI to reimbursement of costs directly incurred in the course of performance. Reimbursement was to be made through the submission of monthly vouchers to MPC. Once verified and approved, the vouchers were transmitted to AID, which authorized payment from the U.S. Treasury directly to PCI in Washington, D.C. The contract provided that "[f]inancing of these services and other costs will be subject to the availability of funds to USAID for this purpose" and "that USAID may, from time to time, exercise [certain] approval rights" includ-

ing "the right to approve the terms of this Contract, the Contractor, and any or all ... specifications ... related to this Contract and the Project of which it is part." Articles III, IV C., Exhibit B to Bolivia's Memorandum in Support of Motion for Relief From Judgment by Default and for Dismissal.

Performance of the contract proceeded smoothly until May 1981, when AID informed MPC that it would discontinue funding of the contract, apparently because PCI had come under investigation by AID's Inspector General and by the Justice Department. On May 21, 1981, MPC advised PCI of the termination of the contract.

PCI's complaint, filed December 30, 1982, alleged that Bolivia had breached the contract by failing to comply with its termination provisions. Specifically, PCI claimed that Bolivia gave inadequate notice of termination, failed to honor a properly submitted "termination claim" voucher, and wrongfully revoked its earlier approval of two PCI vouchers which had not yet been paid by the U.S. Treasury.

Although Bolivia acknowledged service of the complaint, it took no action in defense of the suit. On July 28, 1983, in strict compliance with the provisions of the Foreign Sovereign Immunities Act ("FSIA" or "the Act") governing the award of default judgments against foreign states, 28 U.S.C. § 1608(c) (1982), the Court entered its judgment. Bolivia did not appeal. On October 12, 1984, after determining that a reasonable period of time had elapsed following the entry of judgment, 28 U.S.C. § 1610(c) (1982), the Court issued attachments to the National Bank of Washington and Riggs National Bank against Bolivian embassy accounts. The embassy filed letters of protest four days later, and finally,

on November 14, 1984, counsel appeared on behalf of Bolivia.

### ANALYSIS

The Court turns its attention to Bolivia's motion under Federal Rule of Civil Procedure 60(b) to vacate the default judgment. As grounds for that relief, Bolivia asserts that the judgment is void because, by virtue of Bolivia's sovereign immunity, the Court lacked both subject matter and in personam jurisdiction.[1] PCI makes three colorable arguments in response. First, it maintains that the motion is untimely. Second, PCI argues that lack of jurisdiction is not sufficient grounds to set aside the judgment under Rule 60. Finally, PCI argues that the Court did in fact have jurisdiction to render the judgment. The Court proceeds with an analysis of these three arguments.

#### A.

Rule 60(b) provides in relevant part:

On motion and upon such terms as are just, the court may relieve a party of his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the opera-

---

**1.** Bolivia offers a barrage of additional arguments in support of its motion: that the suit is barred by the act of state doctrine; that the Court should abstain from exercising jurisdiction in deference to the contract's arbitration clause; that Bolivia's failure to defend the action was the excusable result of "a broad divergence in [American and Bolivian] cultural, gov-

ernmental, and political approaches to the present case"; and, that the judgment has been satisfied by virtue of a $249,700.00 consent judgment entered by the United States Claims Court against AID in favor of PCI. Because it considers the jurisdictional issue sufficient to decide the motion, the Court does not reach these other arguments.

tion of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

A threshold issue raised by the briefs is whether Bolivia's motion is time-barred by the last quoted sentence of the rule. The motion was filed on December 4, 1984, more than one year after entry of the default judgment, and so any reliance on clauses (1), (2), and (3) of the rule would plainly be foreclosed. Bolivia's jurisdictional attack, however, falls within clause (4) of the rule. The issue is thus reduced to whether the "reasonable time" limitation in the first clause of the sentence operates to bar the motion.

PCI urges the Court to view the issue in light of the special requirements of the FSIA which assure that a foreign government is apprised of a default against it and given a reasonable opportunity to seek relief prior to any attachment being issued.[2] Bolivia's lengthy delay in making any sort of post-judgment submission to the Court, says PCI, cannot, especially in light of the failure to take advantage of these protections, be regarded as reasonable.

■ It is well established, however, that, despite what a literal reading of the rule would suggest, the "reasonable time" limitation does not apply to a motion under clause (4) attacking a judgment as void.

_Pacurar v. Hernly_, 611 F.2d 179, 181 (7th Cir.1979); C. Wright & A. Miller, _Federal Practice and Procedure_ § 2862 (1973) (hereinafter "Wright & Miller").[3] Our Circuit Court of Appeals has held that "a void judgment, ... [cannot] acquire validity because of laches on the part of him who applies for relief from it," _Austin v. Smith_, 312 F.2d 337, 343 (D.C.Cir.1962). It would be anomolous if the FSIA, with its special solicitude for foreign states, were cited as justification for applying a more stringent rule here.

Parenthetically, the Court notes that it finds nothing at all unreasonable in Bolivia's strategy of waiting until after execution of the judgment was under way to raise its jurisdictional point. As explained in the next section, a defendant who questions a court's jurisdiction over him is free to ignore the suit and attack the default judgment in a subsequent proceeding, provided, of course, that he is willing to undertake the risks associated with that tactic.[4] Bolivia made such a choice here, and even were it not for the rule just cited, the Court would be unable to find that choice unreasonable.

#### B.

■ A judgment is not void merely because it is erroneous. Wright & Miller, § 2862. PCI devotes a considerable portion of its brief to arguing that, even assuming the Court lacked jurisdiction to en-

---

2. For example, under section 1608(e) of the Act, notice of a default judgment against a foreign state must be served in the same specially prescribed manner as the original complaint. Additionally, section 1610(c) requires a court to make a determination that a reasonable period of time has elapsed following the entry and notice of judgment before it can order attachments or executions on the judgment.

   These procedural safeguards were afforded to Bolivia in this case. Service of the order directing entry of judgment was made both through registered international mail and, in Spanish translation, through diplomatic channels. _See_ 28 U.S.C. §§ 1608(a)(3), (4). Over a year passed between Bolivia's first notice of the judgment and the Court's orders of attachment against the embassy accounts. Upon issuance of the orders, the Court made a formal finding that this was a "reasonable time" under section 1610(c).

3. None of the cases cited in PCI's brief involved attacks on void judgments under clause (4). _E.g., Planet v. Sullivan_, 702 F.2d 123, 125 n. 2 (7th Cir.1983). That the "reasonable time" limitation was applied in those cases does not, therefore, contradict the cited rule.

   The Court also notes that, when a party attacks a judgment for voidness, there is no requirement that he show the existence of a meritorious defense, as he must under other clauses of the rule. Wright & Miller, § 2862 at 197.

4. For example, if the subsequent attack is unsuccessful, the defendant will have lost his chance to argue the merits of the suit. Furthermore, as happened in this case, he may suffer the inconvenience of having assets subjected to judicial process if he waits until execution begins to attack that judgment.

ter judgment against Bolivia, that does not amount to the sort of defect that would render the judgment void. Rather, the judgment is, at most, merely erroneous.

The traditional rule is that a judgment rendered in excess of the court's jurisdiction is void and a legal nullity. *Restatement of Judgments* §§ 5–7 (1942). PCI cites younger authorities that seem to question that rule. One of their cases holds that

In the interest of finality, the concept of void judgments is narrowly construed. While absence of subject matter jurisdiction may make a judgment void, such total want of jurisdiction must be distinguished from an error in the exercise of jurisdiction. A court has the power to determine its own jurisdiction, and an error in that determination will not render the judgment void. Only in the rare instance of a clear usurpation of power will a judgment be rendered void.

*Lubben v. Selective Service System Local Board No. 27*, 453 F.2d 645, 649 (1st Cir. 1972) (footnote omitted). PCI relies on these authorities to argue that, if the Court erred in accepting the complaint's allegation that it had jurisdiction, Bolivia's only remedy was by timely appeal.

All of PCI's authorities, however, address situations where the defendant raised (or should have raised) the jurisdictional issue prior to the attack in question. They seem to offer an escape from the general rule because they do not distinguish voidness and issue preclusion.

Where a defendant appears in the original suit and raises the jurisdictional issue but has it determined against him, he is barred from relitigating the issue in a subsequent voidness attack. *Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963).[5] Similarly, if the party

charged with the judgment appeared in the action but did not actually assert lack of jurisdiction, he is foreclosed from raising it for the first time in a Rule 60(b)(4) motion or collateral attack. *Honneus v. Donovan*, 93 F.R.D. 433, 437–38 (D.Mass.), *affirmed*, 691 F.2d 1 (1st Cir.1982). "By hypothesis the party had opportunity to raise the jurisdictional defense. There is little reason for saying it should survive the judgment when defenses on the merits would not." F. James & G. Hazard, *Civil Procedure*, § 13.16 at 696 (2nd ed. 1977).[6]

On the other hand, where, as here, the defendant never appeared in the original suit and thus has not yet litigated the point, he is not excepted from the rule that a jurisdictional defect renders a judgment void. "A defendant is always free to ignore the judicial proceedings, risk a default judgment and then challenge that judgment on jurisdictional grounds in a collateral proceeding." *Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). *See also Baldwin v. Traveling Men's Association*, 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931); *Maritime International Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1099 n. 9 (D.C.Cir. 1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983) (hereinafter *"MINE"*); James & Hazard, § 13.16 at 697; 59 A.L.R.Fed. 831 (1982).

Accordingly, if this judgment suffers from a jurisdictional defect, it is void. In an action against a foreign state, the existence of both subject matter and personal jurisdiction turns on whether the defendant state is entitled to sovereign immunity under the FSIA. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n. 5, 103 S.Ct. 1962, n. 5, 76 L.Ed.2d 81

---

5. Of course, this litigant could seek to have the initial jurisdictional determination reversed for error on appeal.

6. PCI has attempted to place Bolivia's attack on the judgment into this second category of cases by saying that Bolivia's telegram of acknowledgment of receipt of service constitutes a general

appearance. Plaintiff's Memorandum in Opposition at 4. The mere return of process is not an "appearance." *See generally* Wright & Miller, § 2868 at 430, 434–35 ("[a]n appearance in an action involves some presentation or submission to the court").

(1982); *MINE*, 693 F.2d at 1099; 28 U.S.C. §§ 1330(a), (b) (1982). The next section of this opinion discusses that issue.

### C.

The provisions of the Act relevant to sovereign immunity are set forth below.

§ 1604. IMMUNITY OF A FOREIGN STATE FROM JURISDICTION. Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

§ 1605. GENERAL EXCEPTIONS TO THE JURISDICTIONAL IMMUNITY OF A FOREIGN STATE. (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

§ 1606. EXTENT OF LIABILITY....

§ 1607. COUNTERCLAIMS....

Since neither party has directed the Court's attention to any international agreements affecting Bolivia's sovereign immunity in this case, the issue depends upon the application of section 1605 of the Act. PCI argues for exceptions to immunity under both subsections (a)(1) and (a)(2).

The Court will address the "commercial activity" exception first.

### 1.

■ The FSIA codified the "restrictive" common law theory of sovereign immunity. Under this theory, immunity is limited to cases arising from "public" or "governmental" acts. If the activity sued upon is not governmental but "commercial," then the foreign state is not entitled to immunity. *See Hearings on H.R. 3493 Before Subcommittee on Claims and Governmental Relations of the House Committee on the Judiciary*, 93d Cong., 1st Sess. 15 (1973) (testimony of Charles N. Brower, Legal Advisor, Department of State).

Not surprisingly, then

[t]he determination of whether particular behavior is "commercial" is perhaps the most important decision a court faces in an FSIA suit.... Unfortunately, the definition of "commercial" is the one issue on which the Act provides almost no guidance at all. Subsection 1603(d) advances the inquiry somewhat, for it provides: "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." No provision of the Act, however, defines "commercial." Congress deliberately left the meaning open and, as noted above, "put [its] faith in the U.S. courts to work out progressively, on a case-by-case basis ... the distinction between commercial and governmental."

*Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300, 308–09 (2nd Cir. 1981) (Kaufman, J.) (citations omitted), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) (hereinafter *"Texas Trading "*).

The Court has no quarrel with PCI's proposition that an otherwise commercial activity does not lose its commercial character because it was entered into in connection with an AID program. H.Rep. No. 94–1487, 94th Cong., 2d Sess. 16 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6614 (hereinafter "House Report").

But this does not assist the Court in determining whether, apart from AID funding, the activity involved in this contract dispute is commercial or governmental.

PCI argues that a contract between a foreign state and a private party for the purchase of goods or services is *per se* a commercial activity. *Texas Trading*, 647 F.2d at 309, is cited for this proposition. But that opinion merely observes that "[t]he House Report *seems* to conclude that a contract or series of contracts for the purchase of goods would be *per se* a 'commercial activity,'" *id.* (emphasis added). The House Report in fact goes on to state that "[t]he courts would have a great deal of latitude in determining what is a 'commercial activity' for purposes of this bill. It has seemed unwise to attempt an excessively precise definition of this term, even if that were practicable." House Report at 16, U.S.Code Cong. & Admin.News 1976, at 6615. And in practice courts have not automatically treated every contract for goods or services as commercial activity. *E.g., Tuck v. Pan American Health Organization*, 668 F.2d 547, 550 (D.C.Cir.1981) (employment contract held not commercial activity); *Broadbent v. Organization of American States*, 628 F.2d 27, 33–36 (D.C. Cir.1980) (same); *International Association of Machinists v. Organization of Petroleum Exporting Countries*, 477 F.Supp. 553, 567 (C.D.Cal.1979), *aff'd on other grounds*, 649 F.2d 1354 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982) (contracts for sale of petroleum not "commercial activity" since that term should be narrowly construed); *Carey v. National Oil Corp.*, 453 F.Supp. 1097, 1102 (S.D.N.Y.1978), *aff'd*, 592 F.2d 673 (2nd Cir.1979) (same).

A more useful approach is to consider the rationale for the distinction between commercial and governmental activity. In his thorough analysis in the leading *Texas Trading* case, Judge Kaufman quoted two expressions of the reasoning behind the rule:

> If a government enters into a contract to purchase goods and services, that is considered commercial activity. It avails itself of the ordinary contract machinery. It bargains and negotiates. It accepts an offer. It enters into a written contract and the contract is to be performed.

*Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary*, 94th Cong., 2d Sess. 51 (1976) (testimony of Bruno Ristau, Chief of Foreign Litigation Section of Civil Division, U.S. Department of Justice), *quoted in Texas Trading*, 647 F.2d at 309.

> If a government department goes into the market places of the world and buys boots or cement—as a commercial transaction—that government department should be subject to all the rules of the marketplace.

*Trendtex Trading Corp. v. Central Bank of Nigeria*, 2 W.L.R. 356, 369, 1 All E.R. 881 (1977) (Lord Denning), *quoted in Texas Trading*, 647 F.2d at 310. Judge Kaufman crystallized his analysis down to the following rule of thumb, which has been frequently applied by federal courts: "[I]f the activity is one in which a private person could engage, it is not entitled to immunity." *Texas Trading*, 647 F.2d at 309.

■ Is the activity contemplated by this contract activity "in which a private person could engage"? The Court thinks not. The text of the contract includes numerous terms which only a sovereign state could perform, and which no private firm or individual going into the market place could ever offer.

For instance, the Bolivian government agreed to "[r]elieve [PCI's] expatriate staff from corporation and income tax, import duty and sales tax on imports, sales tax on services and stamp duty for the Contract otherwise imposed under the laws and regulations in effect in Bolivia in respect to" their activities under the contract. Appendix B, § VII B.[7] Bolivia also agreed to provide for the "prompt duty free clearance through customs" of the supplies and

---

**7.** The appendices are incorporated into the contract by Article IV A.

personal effects of the PCI staff entering Bolivia. *Id.* Further, the government bound itself to "promptly provide" all required entry and exit visas, exchange permits, and travel documents. *Id.* MPC agreed to exercise the extent of its legal authority in expediting any necessary documentation for the expatriate staff, such as automobile registration, drivers' licenses, and tax and duty exemption documents. Appendix A, § B. Finally, the contract entitled the expatriate staff to certain diplomatic privileges such as access to the U.S. Embassy Commissary and health facilities, and use of the embassy pouch for official and personal mail. Appendix B, § G.

The issue presented by these facts is the same issue that was anticipated in *Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094 (S.D.N.Y.1982). In that case, two American citizens sued an agency of the Republic of Ireland, with whom they had entered into a joint venture agreement for the establishment of an industrial enterprise in Ireland. The agency, Gaeltarra Eireann ("GE"), had informed the plaintiffs that the joint enterprise would qualify for certain tax incentives made available by Irish law. The court held that the defendant was not entitled to sovereign immunity since "[e]very obligation undertaken by GE in the Joint Venture Agreement contemplated activity in which, by nature, a private party could engage." *Id.* at 1110. In a footnote to that holding, however, the court remarked

> The only arguable exception involves the tax incentives that GE told plaintiffs would be available for [the joint venture enterprise] and for plaintiffs as [its] proprietors[.] Plainly, a private party is not capable of unilaterally amending a prevailing tax statute in order to reduce another party's prospective tax burden. Thus, GE did indeed engage in non-commercial activity if it arranged for plaintiffs to be afforded a special tax advantage under Irish law. However, the complaint alleges that the tax incentives in question were generally available under Irish law, and that GE merely apprised

plaintiffs of the existence of these incentives.... Therefore, accepting plaintiffs' jurisdictional allegations as true, the tax aspect of the Joint Venture Agreement did not alter the purely commercial nature of GE's participation in the Joint Venture Agreement. The Court thus need not decide the difficult question of the jurisdictional result that would flow from a mixed commercial/non-commercial activity such as would have existed here if GE, instead of being merely an entity designed to enable potential investors to take advantage of certain favorable Irish tax laws, had been given its own de facto law-making power in order to offer prospective investors special tax incentives as part of GE's contribution to a joint venture. *Id.* at 1110 n. 6.

The facts in the present case are even more compelling than those hypothesized in *Gibbons*. In addition to the tax exemption mentioned there, Bolivia promised PCI preferential bureaucratic treatment and diplomatic privileges. To paraphrase the holding of *Gibbons*, many of the obligations undertaken by Bolivia in the contract contemplated activity in which, by nature, a private party could not engage.

As we have seen, the commercial activity exception resembles an estoppel—foreign states who do business in the manner of private parties ought to be held to the same legal rules as private parties. *See* text at 869, *supra*. *See also International Association of Machinists v. Organization of Petroleum Exporting Countries*, 649 F.2d 1354, 1357 n. 6 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). Under this rationale, there is nothing unfair about recognizing Bolivia's sovereign immunity in this case. By granting special legal advantages to PCI Bolivia was acting in a manner very much unlike a private business participant. The nature of PCI's performance would have been quite different if it had performed the same services for a private Bolivian concern. The commercial activity exception is therefore inapplicable.

2.

PCI insists that Bolivia has implicitly waived its sovereign immunity under section 1605(a)(1) of the Act by entering into the following arbitration agreement:

XIX. DISPUTES AND ARBITRATION

A. Any disputes arising under this Contract shall be submitted by the Contractor to MPC. MPC shall notify the Contractor of its decision within thirty (30) days of receipt from the Contractor of the written grievance or difference of opinion. The decision of MPC shall be final and conclusive unless within thirty (30) days from the date of receipt of such decision, the Contractor shall deliver to MPC notice of its intention to submit the dispute to arbitration.

B. Where disputes are submitted to arbitration, the parties agree to accept the decision of the arbitrators as final and binding on both parties. Each party shall have the right to appoint one arbitrator. The two arbitrators so appointed shall select a third arbitrator acceptable to the two appointed arbitrators.

C. Arbitration shall be conducted at a site determined by the arbitrators, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce and Bolivian Law, and judgment upon the award may be entered in any court having jurisdiction thereof.

Appendix B, § XIX.[8]

██ A passage from the FSIA's legislative history reads:

With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract.[9]

House Report at 18, U.S.Code Cong. & Admin.News 1976, at 6617 (footnote added). This Court has relied on that statement to assume jurisdiction over foreign states that entered into arbitration agreements with private plaintiffs. *Birch Shipping Co. v. Embassy of Tanzania*, 507 F.Supp. 311, 312 (D.D.C.1980); *Ipitrade International, S.A. v. Federal Republic of Nigeria*, 465 F.Supp. 824, 826 (D.D.C.1978). But both of those cases involved proceedings that were directly related to the arbitration. *Ipitrade* concerned a petition for judgment on an arbitration award. *Birch Shipping* was a suit for execution on an arbitration award. PCI has not cited, nor has the Court's own research revealed, any case where a court has invoked an arbitration agreement as the basis for depriving a foreign state of immunity from a suit *on the merits* of a dispute.

This distinction is controlling. The reasoning behind the pre-FSIA cases imprecisely referred to in the quoted passage of the House Report was "that [arbitration] agreements could only be effective if deemed to contemplate a role for [the] courts in compelling arbitration that stalled along the way," *MINE* 693 F.2d at 1103, and that "[t]o hold otherwise would be to render the arbitration clause a nullity," *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 363 (2nd Cir.1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965) (suit to compel arbitration). *See also Petrol Shipping Corp. v. Kingdom of Greece*, 360 F.2d 103, 107 (2nd Cir.1966) (suit to compel arbitration). That logic does not extend to this case. The effectiveness of this arbitration clause does not depend upon this Court's assumption of

---

**8.** PCI has not explained why it did not seek to compel arbitration of the present dispute pursuant to this clause, except to say that once the contract was terminated, "all efforts at further communication with the Bolivian government [were] in vain." Rosenberg Affidavit ¶ 11. PCI asserts that "Bolivia has long ago waived its right to demand arbitration," Plaintiff's Memorandum in Opposition 31 n. 8, but the quoted provisions of the contract clearly put the burden

of pursuing arbitration on PCI. Besides, Bolivia had no reason to initiate arbitration since it was PCI, not Bolivia, that was dissatisfied with the state of affairs that existed when the parties ceased communications.

**9.** The contract is governed by Bolivian law. Appendix B, § VI.

jurisdiction over a suit on the merits. On the contrary, an initial determination of the parties' rights by this Court would be destructive of their intention to have disputes resolved by neutral arbitrators. Bolivia cannot therefore be said to have implicitly waived its immunity from this suit.

The Court's conclusion is consonant with the strong judicial policy of encouraging international commercial arbitration in order to facilitate international trade and cooperation. *E.g., Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum selection clause that posits not only the situs ... but also the procedure to be used."); *MINE*, 693 F.2d at 1102–04. As Chief Justice Burger has written in a closely related context:

> The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9, 92 S.Ct. 1907, 1912, 32 L.Ed.2d 513 (1972) (applying choice of forum clause in international contract). Accordingly, section 1605(a)(1) of the FSIA should not be construed to encourage federal courts to compete with or undermine freely agreed arbitration, but to ensure compliance with the agreement. Comment, *Implicit Waivers of Sovereign Immunity by Consent to Arbitration*, 18 Tex.Int'l L.J. 329 (1983).

## CONCLUSION

For all of the preceding reasons, the Court determines that its default judgment against Bolivia is void, and that the case must be dismissed for lack of jurisdiction.[10] The dismissal shall be without prejudice to resolution of the dispute in a proper forum.

It follows of course that the writs of attachment issued in furtherance of the judgment must be quashed. PCI's motion for discovery sanctions, which requests an order precluding Corporacion Minera de Bolivia from establishing its claim to the garnished accounts, is mooted.

An order conforming to this memorandum shall be filed herewith.

## ORDER

This matter comes before the Court on Defendant's Motion for Relief From Judgment by Default and for Dismissal of Suit and to Vacate Order of Execution, Plaintiff's Motion for Judgment of Condemnation Against Garnishee, and Defendant's motion to quash same, and Plaintiff's Motion for Sanctions Against Claimant Corporacion Minera de Bolivia. The Court has studied the entire record in this matter and has filed its Memorandum Opinion of even date. Wherefore, it is this 11th day of July, 1985

ORDERED that Defendant's Motion for Relief From Judgment by Default and for Dismissal of Suit and to Vacate Order of Execution be and hereby is granted, and it is

FURTHER ORDERED that Defendant's Motion to Quash Plaintiff's Motion for Judgment of Condemnation Against Garnishee be and hereby is granted, and it is

---

**10.** The Court would have preferred Bolivia to support its motion with affidavits more extensive than the very brief statement of the MPC Subminister attached to its Reply Memorandum. But this deficiency does not prevent the Court from granting the motion. Even if it is controlled by Rule 56 [since the exhibits supporting it are "matters outside the pleadings," F.R.Civ.P. 12(b) ], the Court may grant the motion without affidavits if legal grounds therefor

are established in some other way. *Fletcher v. Evening Star Newspaper Co.*, 133 F.2d 395, 396 (D.C.Cir.) (per Curiam), *cert. denied*, 319 U.S. 755, 63 S.Ct. 1163, 87 L.Ed. 1708 (1942); Wright & Miller, § 2722 at 55 n. 25. Since the issues here are predominantly legal, not factual, the Court is satisfied in deciding the motion upon the documents introduced. *See* Wright & Miller, § 2722 at 60 n. 38.

FURTHER ORDERED that Plaintiff's Motion for Sanctions Against Claimant Corporacion Minera de Bolivia be and hereby is denied, and it is

FURTHER ORDERED that the default judgment entered in this matter against Defendant on July 28, 1983 be and hereby is vacated, and it is

FURTHER ORDERED that the orders of attachment issued in this matter on October 12, 1984 to National Bank of Washington and to Riggs National Bank be and hereby are vacated, and it is

FURTHER ORDERED that this case be and hereby is dismissed for lack of subject matter and personal jurisdiction with prejudice.