**PRACTICAL CONCEPTS, INC., Plaintiff,**

v.

**REPUBLIC OF BOLIVIA, Defendant.**

**Civ. A. No. 82–3706.**

United States District Court, District of Columbia.

Aug. 29, 1985.

---

**4.** Trooper Bergbigler was off duty at the time and was not said to be carrying or using a gun.

Neil I. Levy, Melrod, Redman & Gartlan, Washington, D.C., for plaintiff.

William R. Joyce, Jr., Thomas T.F. Huang, Vance, Joyce, Carbaugh & Huang, Washington, D.C., for defendant.

L. Marc Zell, Topf, Zell, Kolodny & Goldlstein, Bethesda, Md., for garnishee.

## MEMORANDUM ORDER

BARRINGTON D. PARKER, District Judge.

This matter comes before the Court upon the motion of plaintiff, Practical Concepts, Inc. ("PCI"), to reconsider its Memorandum Opinion and Order of July 11, 1985, 613 F.Supp. 863. In that ruling the Court decided, among other issues, whether the action was based upon a "commercial activity" within the meaning of the Foreign Sovereign Immunities Act ("FSIA" or "the Act"), 28 U.S.C. § 1605(a)(2) (1982). The Court applied the test of *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2nd Cir.1981, *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) and held that the activity at issue was not commercial since "many of the obligations undertaken by Bolivia in the contract contemplated activity in which, by nature, a private party could not en-

gage." Mem.Op. at 18, *citing Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1110 n. 6 (S.D.N.Y.1982). PCI believes that these obligations are "incidental" to the contract and "do not affect the essence of the bargained-for exchange, namely, consulting services for payment." Pl.Mem. at 3.[1] Since the Act itself does not define "commercial activity," PCI relies almost entirely upon the legislative history. H.Rep. No. 94–1487, 94th Cong., 2d Sess. 16 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6614 (hereinafter "House Report").

The Court adheres to its decision. The House Report states that "a single contract, *if of the same character as a contract which might be made by a private person,* could constitute a [commercial activity]." *Id.* (emphasis added). This is exactly the analysis undertaken by the Court in its Memorandum Opinion. Stated only somewhat differently, a court presented with a contract action against a foreign state must determine whether the state, in entering the contract, "acted in a sovereign or essentially private capacity." *Transamerican Steamship Corp. v. Somali Democratic Republic,* 767 F.2d 998, 1002 (D.C.Cir.1985). Where, as here, a state exempts a private party from taxation, grants preferential bureaucratic treatment, and diplomatic privileges, it is acting in a sovereign capacity.

To hold, as PCI urges, that because they are "essentially" private acts, contracts are *per se* actionable under the FSIA, would be to read the underscored qualification out of the House Report. This is precisely the sort of wooden approach which Congress rejected when it left the term "commercial activity" deliberately vague and instead entrusted the courts with "a great deal of latitude" to define it. H.Rep. at 16. In executing that commission, the Court has given a purposive, rather than a mechanical, construction to the Act.

---

1. PCI also observes that the Court's ground of decision was not argued by Bolivia. Ideally, where the adversarial model of equally capable counsel and equally vigorous argument is appli- cable, judges may act solely in their role as neutral arbiters. The Court regrets that that model has not prevailed in this case.

■ The Act confers jurisdiction where the action is "based upon a commercial activity." The basis of the present action is the contract between PCI and Bolivia. Therefore, as PCI recognizes, that contract must be viewed "as a whole," Pl.Mem. at 2, and it would be wrong to sift out whichever of its terms do not support a certain preconceived characterization of its nature.

Although contracts for goods or services may presumptively be "commercial activity," courts have not, as mentioned in the Memorandum Opinion, shown any reflexive tendency to treat all contractual activity as "commercial" without first examining whether the activity is of a kind in which a private party might engage. *E.g., Gittler v. German Information Center,* 95 Misc.2d 788, 408 N.Y.S.2d 600 (Sup.Ct.1978) (no FSIA jurisdiction over suit on contract to produce motion pictures).[2] The same point has been made by a commentator:

> A section-by-section analysis of the Act published in a House Report implies that the sale of a service is an inherently commercial act. Nevertheless, cases indicate that courts will make fine distinctions in this area.

Note, *Establishing Jurisdiction Under the Commercial-Activities Exception to the Foreign Sovereign Immunities Act of 1976,* 19 Hous.L.Rev. 1003, 1013 (1982), *citing, inter alia, Castro v. Saudi Arabia,* 510 F.Supp. 309, 312 (W.D.Tex.1980). The Note goes on to observe that where, as here, the contract pertains to development of a nation's natural resources, courts have examined the jurisdictional question with special care. *Id.* at 1014.

■ The Court is unaware of any case, other than the hypothesis in *Gibbons, supra,* that decides whether a contract for goods or services loses its presumptively commercial character by the associated exercise of fundamental sovereign powers.[3] It is not true, as PCI suggests, that a foreign state could easily evade the intended jurisdiction of American courts by incorporating promises to perform sovereign acts into otherwise commercial contracts. A foreign state could not unilaterally change a "commercial" contract into a "governmental" one, any more than a private party could unilaterally insert a waiver of immunity or arbitration clause into the same contract. The essence of contract is mutuality. Since the commercial activity exception is rooted in the concepts of estoppel and reliance, it is reasonable to say that when a private party bargains for and agrees to accept the benefit of a state's exercise of its sovereign powers, that party should not be surprised when the state invokes its sovereign right of immunity.

■ PCI argues that "Congress clearly intended to subject AID grant contracts to the jurisdiction of the United States courts" and that the Court's holding defeats that intention since the provisions on which it relied "are required as an integral part of the AID program." Pl.Mem. at 6–7. First, the Court divines no such Congressional intention. The only direction of the House Report is that AID participation is irrelevant to the nature of the activity. If Congress had so clearly intended American courts to have jurisdiction, it could easily have mandated, through regulation, a waiver of immunity clause in all AID

---

**2.** PCI takes issue with the other cases which the Court cites for this proposition because only two of them, *Tuck v. Pan American Health Organization,* 668 F.2d 547 (D.C.Cir.1981) and *Broadbent v. Organization of American States,* 628 F.2d 27 (D.C.Cir.1980), asserted breach of contract claims, and the other cases asserted tort claims based on contractual activity. Section 1605, however, does not distinguish between claims sounding in tort and those in contract, the only question being the nature of the activity on which the action is based.

**3.** *Birch Shipping Corp. v. Embassy of United Republic of Tanzania,* 507 F.Supp. 311 (D.D.C.

1980) did not involve distinguishing commercial from non-commercial activity. That case applied a section of the Act which subjects to execution assets "used for a commercial activity." 28 U.S.C. § 1610(a). The issue was only "whether it is proper to attach an account which is not used *solely* for commercial activity," 507 F.Supp. at 313 (emphasis in original). The court was not troubled by which uses of the account were commercial and which were non-commercial. The issue was only whether the word "solely" ought to be read into the section.

grant contracts. Second, the Court finds it significant that PCI cannot cite AID regulations requiring most of the provisions of this contract on which the Memorandum Opinion relied, such as the provisions for tax exemption, duty free clearance through customs, and bureaucratic preferences. Even if it could, the Court is not sure what relevance they would have, since one of the few things that the FSIA clearly states is that it is the nature, and not the purpose, of the defendant state's activity that is relevant. 28 U.S.C. § 1603(d). It should not matter, then, whether Bolivia exercised its sovereignty in this case voluntarily or as a condition of the grant.

The Court believes that its decision is just, as well as legally accurate. As noted in the Memorandum Opinion, PCI chose to ignore its agreement to submit disputes to arbitration, and sought instead to hale Bolivia into a non-neutral forum. The Court has already discussed its reasons and authorities for viewing that course of conduct with extreme disfavor. Mem.Op. at 20 n. 8, 21–22. It is sufficient to add here only that the Supreme Court has very recently reiterated those concerns in *Mitsubishi Mo-*

*tors v. Soler Chrysler-Plymouth,* —— U.S. ——, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). There the Court noted "the emphatic federal policy in favor of arbitral dispute resolution" and that "that policy applies with special force in the field of international commerce." *Id.* at ——, 105 S.Ct. at 3356–3357. That policy must be even stronger where one of the parties to the arbitration is a co-equal sovereign nation. It is therefore proper to "require this representative of the American business community to honor its bargain." *Id.* at ——, 105 S.Ct. at 3361.

### ORDERED

That Plaintiff's Motion to Reconsider the Court's Memorandum Opinion and Order of July 11, 1985, as amended July 15, 1985, be and hereby is denied.