PRACTICAL CONCEPTS,
INC., Appellant,

v.

REPUBLIC OF BOLIVIA, et al.

No. 85–6001.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 6, 1986.

Decided Feb. 17, 1987.

As Amended March 6, 1987.

Neil I. Levy, Washington, D.C., for appellant.

Alexander W. Whitaker, with whom William R. Joyce, Jr., Washington, D.C., was on the brief, for appellee. Thomas T.F. Huang, Washington, D.C., entered an appearance, for appellee.

Richard K. Willard, Assistant Attorney General, Department of Justice, Joseph E. diGenova, United States Attorney, David Epstein and Michael J. Singer, Attorneys, Department of Justice, and Bruce C. Rashkow, Attorney, Department of State were on the brief for the United States as amicus curiae.

Before WALD, Chief Judge, RUTH BADER GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

■ This case requires judicial interpretation of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602–1611, a measure Congress enacted in 1976 to govern the sensitive matter of the amenability of a foreign nation to suit in the United States. Under the FSIA, a district court may entertain a civil action against a foreign state only if the foreign state lacks immunity under the Act's prescriptions, *i.e.*, 28 U.S.C. §§ 1605–1607, or under an international agreement. 28 U.S.C. § 1330.[1] Sovereign immunity under the FSIA is thus a gateway issue, not simply a

---

1. 28 U.S.C. § 1330 reads:

Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

plea in defense to a claim: if the foreign state is entitled to immunity with respect to the claim asserted, then the district court lacks both subject matter and personal jurisdiction, and must dismiss the case. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 n. 20, 103 S.Ct. 1962, 1971 n. 20, 76 L.Ed.2d 81 (1983); *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1389–90 (5th Cir.1985); *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328 (9th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).

The parties to the instant lawsuit are plaintiff-appellant Practical Concepts, Inc. (PCI), a private enterprise organized and operating in the United States, and defendant-appellee Republic of Bolivia (Bolivia). PCI alleged Bolivia's breach of a technical assistance and consulting services contract. Signed in August 1979, the contract-in-suit called for PCI's services in designing and implementing a comprehensive program for development of Bolivia's rural areas. The contract was to continue for a period of three years; while PCI and Bolivia were the sole contracting parties, funding for the venture came from the United States Agency for International Development (AID). In May 1981, Bolivia received notice that AID would no longer fund the contract. That same month, Bolivia terminated the agreement.

On December 30, 1982, PCI filed a complaint in the district court charging Bolivia with unlawful termination of the contract. Bolivia, by telegram addressed to PCI's counsel, acknowledged receipt of process, but did not otherwise respond to PCI's complaint. On July 28, 1983, the district court entered a default judgment against Bolivia.

Over a year later, PCI commenced execution proceedings. Bolivia then moved, un-der Rule 60(b) of the Federal Rules of Civil Procedure, for relief from the judgment. Among several asserted grounds for relief, Bolivia claimed immunity, as a foreign sovereign, from suit in any court in the United States. The district court granted the motion, vacated the default judgment, and dismissed the action on the ground that the governing FSIA provisions, 28 U.S.C. §§ 1604–1605, shielded Bolivia from PCI's lawsuit. *Practical Concepts, Inc. v. Republic of Bolivia*, 613 F.Supp. 863, *recon. denied*, 615 F.Supp. 92 (D.D.C.1985). Having ruled dispositively on the threshold jurisdictional issue, the district court did not reach Bolivia's alternate pleas, including, *inter alia*, the argument that the court should abstain from entertaining PCI's complaint in deference to the arbitration clause in the contract. 613 F.Supp. at 865 n. 1.

On appeal, PCI initially contends that the default judgment should have remained closed. We find this contention insubstantial and hold that the district court, in view of Rule 60(b)(4) and (6), properly allowed full consideration of Bolivia's jurisdictional objection. More prominently, PCI maintains that this case fits within the "commercial activity" exception to the rule according foreign sovereigns immunity from suit, 28 U.S.C. § 1605(a)(2) (set out *infra* pp. 1548–1549). We conclude that the district court improperly rejected application of that exception. Nonetheless, we do not instruct immediate reinstatement of the default judgment. Instead, we remand the case so that the district judge may consider Bolivia's alternate pleas, particularly Bolivia's defense based on the arbitration clause of the contract between PCI and Bolivia.[2]

### I.

PCI urges two reasons why the district court should not have entertained Bolivia's

---

**2.** In arriving at this disposition, we have been aided by a brief amicus curiae filed by the United States on January 7, 1987. That brief was invited by the court in an October 14, 1986 request, and was presented pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to attend to the interests of the United States in a pending suit. PCI filed a Supplemen-

tal Brief in response on January 28, 1987. The amicus curiae brief took no position on the application of the "commercial activity" exception to this case, but did urge a remand, in the event we held the exception applicable, for district court consideration of alternate defenses Bolivia raised. *See also infra* note 21.

motion for relief from the judgment entered July 28, 1983 upon Bolivia's default. First, in a telegram addressed to PCI's counsel, Bolivia acknowledged receipt of the complaint and notice of suit; PCI regards the telegram as "the functional equivalent of an appearance." Brief of Appellant at 9. Second, PCI asserts that Bolivia should not be allowed to mount a collateral attack on the judgment because Bolivia deliberately bypassed "numerous opportunities to challenge the ... facts upon which the court's jurisdiction depended." *Id.* Neither reason supplies cause for ruling the 60(b) motion out of order.

■ The telegram PCI features was dispatched from Bolivia on February 24, 1983 by a Bolivian engineer, subsecretary at Bolivia's Ministry of Planning and Coordination. The addressee, who received the telegram the next day, is the attorney whose signature appears on PCI's complaint.[3] The message, running less than five lines, acknowledges receipt of pleadings and refers to the governance of the laws of Boliv-

ia, as stated in "General Provisions" appended to the contract between Bolivia and PCI.[4]

The telegram, we note, does not appear to have been composed or translated by individuals conversant with the dissimilar legal systems of Bolivia and the United States. Overlooking the perils of converting the legal terms and concepts of one system into those of another,[5] PCI insists that the telegram not only shows "Bolivia's consent to the court's jurisdiction to decide the jurisdictional issues," Brief of Appellant at 22, it even "request[s] a trial." *Id.* at 9, 17, 21; Reply Brief of Appellant at 2, 3.

Nothing in or between the lines of the telegram sustains PCI's imaginative rendition. The district judge properly comprehended the telegram as simply an "acknowledgement of receipt of service," not, as PCI pretended, "a general appearance." *Practical Concepts, Inc.,* 613 F.Supp. at 867 n. 6.[6]

---

3. The record includes a copy of the telegram date-stamped "received Feb. 25, 1983," by the law firm then representing PCI. The telegram also shows "CC." to the district court's clerk, but the only indication of clerk's office receipt called to our attention by PCI is a copy bearing an April 5, 1983 filing date stamp.

4. In Spanish, the message reads:
EN RESPUESTA ESCRITO DE AGRAVIOS COMA BAJO REGISTRO ACCION CIVIL NR 82–3706 COMA CORRESPONDE SU DEFENDIDO COMA PROCESAR ENJUICIAMIENTO SEGUN LEYES BOLIVIANAS COMA SEGUN APENDICE B PUNTO VI STOP SEGUIRA NOTIFICACION Y CITACION DE ACUERDO A LEYES CORRESPONDIENTES.
The translation obtained and tendered to the court by PCI reads:
In response to written claims, under Registered Civil Action No. 82–3706, with regard to your defendant, process suit (trial) according to Bolivian laws, in accordance with Appendix B.VI. The notification and citation in agreement with these corresponding laws will follow.

5. *See* R. SCHLESINGER, COMPARATIVE LAW 815–19 (4th ed. 1980) (translation difficulties as a source of confusion in comparative law); *cf. Diaz v. Gonzalez,* 261 U.S. 102, 106, 43 S.Ct. 286, 287–88, 67 L.Ed. 550 (1923) (tendency to view foreign legal system through lens of "our own local education").

6. In urging that the telegram constituted an "appearance" of the sort that forecloses a post-judgment jurisdictional challenge, PCI cites decisions construing the Fed.R.Civ.P. 55(b)(2) specification that notice of an application for a default judgment must be given to a defendant who has "appeared in the action." PCI highlights *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe,* 432 F.2d 689 (D.C.Cir.1970), as holding that two letters between counsel plus a telephone call amounted to an appearance within the meaning of Rule 55(b)(2). Were the question here whether the telegram sufficed to require notice to Bolivia prior to the entry of a default judgment against it, we might well agree that for that particular purpose—notice entitlement—Bolivia indeed had "appeared." It does not follow, however, that an appearance must exist for all purposes or for none. *See* Cook, *"Substance" and "Procedure" in the Conflict of Laws,* 42 YALE L.J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against."). As to the purpose at hand, we think it evident that Bolivia did not appear, *i.e.,* Bolivia did not "waive[ ] its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).

■ Turning to PCI's second position, that Bolivia cannot now challenge the district court's jurisdiction because it passed up "numerous opportunities" to do so, we again uphold the ruling of the district judge. A defendant who knows of an action but believes the court lacks jurisdiction over his person or over the subject matter generally has an election. He may appear, raise the jurisdictional objection, and ultimately pursue it on direct appeal. If he so elects, he may not renew the jurisdictional objection in a collateral attack. *See, e.g., Durfee v. Duke,* 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963); *Baldwin v. Iowa State Traveling Men's Ass'n,* 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (1931). Should he proceed this way, he may defend on the merits in the district court without losing his right to press on direct review the jurisdictional objection, along with objections on the merits. *See, e.g., Baldwin,* 283 U.S. at 525, 51 S.Ct. at 518; *Hassler, Inc. v. Shaw,* 271 U.S. 195, 200, 46 S.Ct. 479, 480, 70 L.Ed. 900 (1926); *Vilter Mfg. Co. v. Rolaff,* 110 F.2d 491, 495 (8th Cir.1940).

Alternatively, the defendant may refrain from appearing, thereby exposing himself to the risk of a default judgment. When enforcement of the default judgment is attempted, however, he may assert his jurisdictional objection. If he prevails on the objection, the default judgment will be vacated. If he loses on the jurisdictional issue, on the other hand, his day in court is normally over; as a consequence of deferring the jurisdictional challenge, he ordinarily forfeits his right to defend on the merits. As set out in RESTATEMENT (SECOND) OF JUDGMENTS § 65 comment b (1982): "When [a] person [named as a defendant] kn[o]w[s] about the action but perceive[s] that the court lack[s] territorial or subject matter jurisdiction, he is given a right to ignore the proceeding at his own risk but to suffer no detriment if his assessment proves correct." *See also Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 706, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding.").

■ In sum, PCI has recited inapposite precedent,[7] but not a single decision that casts genuine doubt on the district court's determination: Bolivia could "wait [ ] until

---

**7.** In particular, PCI identifies *Honneus v. Donovan,* 691 F.2d 1 (1st Cir.1982), as "a remarkably similar case." Brief of Appellant at 13. We find the two cases notably different.

*Honneus* invoked the diversity jurisdiction of the Massachusetts federal district court. Plaintiff Honneus sued his then brother-in-law, Donovan, for legal malpractice. Donovan, a member of the Massachusetts bar, filed an appearance but was thereafter silent. Eventually, the court entered a default judgment against him. Several months later, Donovan moved for relief from the judgment, pursuant to Fed.R.Civ.P. 60(b); he asserted that diversity jurisdiction never existed because Honneus was not a Florida resident as the complaint had alleged but was in fact a resident of Massachusetts, as was Donovan. The First Circuit upheld the district court's refusal to set aside the judgment.

Had Honneus sued Donovan in a Massachusetts state court, there would have been no occasion, post-judgment, to intone any jurisdictional objection. Essentially, lawyer Donovan was contending that, despite his full awareness of, and recorded appearance in, his brother-in-law's suit, he could sit it out and then, in the event of an adverse federal court judgment, spring the plea that he should have been summoned instead to a local (state) courthouse. Both common sense and venerable precedent, *Des Moines Navigation and Railroad Co. v. Iowa Homestead Co.,* 123 U.S. 552, 8 S.Ct. 217, 31 L.Ed. 202 (1887), supported the First Circuit's judgment that absence of diversity is not a ground upon which collateral attack on a judgment can be mounted.

In the instant case, we observe en passant, there was no recorded appearance—the telegram from the Bolivian engineer to plaintiff's counsel is surely not the equivalent of the docket sheet entry showing that lawyer Donovan had filed an unqualified appearance on his own behalf. More fundamentally, the identity or diversity of United States citizenship matter raised in *Honneus* is hardly comparable to the plea Bolivia presents here—that, because of its status as a foreign sovereign and the nature of the contract at issue, no court in the United States—federal or state—has authority to adjudicate PCI's claim. *Cf. United States v. Kember,* 648 F.2d 1354, 1358–59 (D.C.Cir.1980) (question whether case should have been tried in the federal district court or in the local District of Columbia court across the street described as entailing "at most jurisdiction writ small").

after execution of the judgment was under way to raise its jurisdictional point," so long as it bore "the risks associated with that tactic." *Practical Concepts, Inc.*, 613 F.Supp. at 866. Bolivia undertook the risks —"the inconvenience of having [its] assets subjected to judicial process" following the entry of the default judgment, and the prospect that it might "los[e] [its] chance to argue the merits of the suit." *Id.* at 866 n. 4. Having concluded that the district court correctly entertained Bolivia's post-judgment jurisdictional objection, we turn to the question whether that court correctly upheld the objection.

## II.

The district court, after it vacated the default judgment against Bolivia, ordered PCI's case "dismissed for lack of subject matter and personal jurisdiction with prejudice." *Practical Concepts, Inc.*, 613 F.Supp. at 873. For the activity in question, the district court held, Bolivia was "entitled to sovereign immunity under the FSIA." *Id.* at 867, 869–72.[8] Immunity applied, the district court reasoned, because the contract between Bolivia and PCI included "numerous terms which only a sovereign state could perform, and which no private firm or individual going into the market place could ever offer." *Id.* at 869. Denying PCI's motion for reconsideration, the district court stated: "Where, as here, a state exempts a private party from taxation, grants preferential bureaucratic treat-

ment, and diplomatic privileges, it is acting in a sovereign [as distinguished from a commercial] capacity." *Practical Concepts, Inc.*, 615 F.Supp. at 93.

■ We think the district court misperceived the legislature's intention when the court focused on auxiliary provisions rather than on the agreement's core to classify the contract at issue as "governmental" rather than "commercial." It is more sensible, and faithful to the probable intent of Congress, we believe, generally to center on the basic exchange (*e.g.*, the sale of goods or services), not on the facilitating features (*e.g.*, expediting entrance of personnel and supplies), in determining whether an obligation qualifies as a "commercial activity" for FSIA purposes.[9]

Although we conclude that the PCI–Bolivia contract does fall within the "commercial activity" category, we also find compelling reasons to relieve Bolivia from the ordinary operation of the default judgment. *See* FED.R.CIV.P. 60(b)(6). We therefore remand the case to the district court for consideration of the defenses raised by Bolivia which the district court did not reach.

The FSIA provides that foreign states shall be immune from suit in federal and state courts except in specified circumstances. 28 U.S.C. § 1604.[10] If an exception to the main rule of sovereign immunity applies, then the FSIA confers subject matter jurisdiction on the district courts. 28 U.S.C. § 1330(a).[11] The prime exception to

---

8. The district court rejected PCI's contention that Bolivia had implicitly waived its sovereign immunity under § 1605(a)(1). *Practical Concepts, Inc.*, 613 F.Supp. at 871–72 (agreement to arbitrate a dispute does not deprive a foreign sovereign of immunity from court suit *on the merits* of the dispute). PCI has not pursued that issue on appeal.

9. This case does not present the issue whether a foreign state would be entitled to sovereign immunity in an action *based on* an incidental (performance-facilitating) contract term that only a government could offer and perform. That issue would arise, for example, if a foreign nation were sued for failing to grant a tax exemption it had promised in a contract for the sale of goods. We express no opinion on such a case.

10. 28 U.S.C. § 1604 reads:

    Immunity of a foreign state from jurisdiction
    Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

11. *See supra* note 1. The FSIA authorizes the exercise of personal jurisdiction whenever subject matter jurisdiction exists under § 1330(a) and service of process has been made according to § 1608. 28 U.S.C. § 1330(b). In other words, under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308

the main rule appears in § 1605(a)(2); this exception concerns "commercial activity":

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . . .

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.] [12]

When a plaintiff invokes the exception, the court confronts a classification question: Is the activity upon which the action is based properly typed "commercial" rather than "governmental"?

Congress, in an FSIA definition section, § 1603(d), stated:

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

Congress did not further say what it meant by the word "commercial." Instead, it "deliberately left the meaning open and ... 'put [its] faith in the U.S. courts to work out progressively, on a case-by-case basis ... the distinction between commercial and governmental.'" *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308–09 (2d Cir.1981) (quoting

*Hearings on H.R. 11315 before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 53 (1976) (hereafter *Hearings* ) (testimony of Monroe Leigh, Legal Adviser, Department of State)).

The district court, in the case at hand, recognized that a contract between a foreign state and a private party for the purchase of goods or services "may presumptively be," but is not inevitably, "commercial activity." *Practical Concepts, Inc.,* 615 F.Supp. at 94 (order denying reconsideration); *see id.,* 613 F.Supp. at 869 (rejecting *per se* categorization and citing instances of sales and service contracts held not within FSIA's commercial activity exception). Thus far, we are in accord with the district court. Nor do we question the "rule of thumb," crystallized by Second Circuit Judge Kaufman, which the district court quoted: " '[I]f the activity is one in which a private person could engage, it is not entitled to immunity.' " 613 F.Supp. at 869 (quoting *Texas Trading,* 647 F.2d at 309). We part company with the district court, however, in the turn it gave to the *Texas Trading* rule of thumb.

The district court crystallized its own analysis by asking: "Is the activity contemplated by [the PCI–Bolivia] contract activity 'in which a private person could engage'?" 613 F.Supp. at 869. Not in all respects, the district judge pointed out, for the contract included terms only a government could perform. *Id.* Those terms, PCI asserts and we agree, were "incidental" or auxiliary; they do not denote the essential character of the agreement.

The terms that the district court found dispositive were these. First, Bolivia exempted PCI employees dispatched to work

---

(2d Cir.1981). *See also* Restatement (Revised) of Foreign Relations § 453 comment c and reporters' note 3 (Tent. Final Draft 1985) (although a foreign state has not been held to be a "person" within the meaning of the due process clause, Congress apparently intended that, under FSIA, foreign states would be treated like private entities for purpose of checking for fundamental fairness court's exercise of its authority over a particular defendant).

**12.** The three clauses of § 1605(a)(2) concern the sufficiency of the relationship of the foreign state's commercial activity to the United States. The issue before us on this appeal is whether Bolivia's activity was "commercial" rather than whether it had sufficient connection to the United States. We express no opinion on the nexus question.

on the contract in Bolivia from certain taxes. Record Excerpts (hereafter R.E.) N–10. Bolivia also undertook to expedite bureaucratic processes for entering and leaving the country. R.E. N–10 (clearance of supplies through customs, provision of travel documents and exchange permits). In addition, Bolivia promised not to object if the United States chose to grant PCI personnel diplomatic privileges. R.E. N–14.

Congress did indeed contemplate that courts would regard as key the question whether the foreign sovereign's contract at issue is "of the same character as a contract which might be made by a private person." H.REP. No. 1487, 94th Cong., 2d Sess. 16 (1976), *reprinted in* 1976 U.S.CODE CONG. & ADMIN.NEWS 6604, 6615.[13] But the legislature, so far as we can tell, did not intend that the "character" of a contract would turn on its subsidiary rather than its central prescriptions. The essence of the Bolivia-PCI contract plainly was the exchange of money for advice on the development of rural areas. Prompt provision of documents to facilitate entry of material and personnel and tax exemptions to simplify PCI's receipt of payments from Bolivia,[14] just as plainly, were auxiliary to the basic exchange.[15]

A foreign state, Congress anticipated, would be answerable in court, just as a private party is, when it acts in an essentially private rather than sovereign capacity. *Transamerican Steamship Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C.Cir.1985); *see Hearings, supra* pp. 12–13, at 24, 30 (testimony of Monroe Leigh, Legal Adviser, Department of State and Bruno A. Ristau, Chief, Foreign Litigation Section, Civil Division, Department of Justice); 2 RESTATEMENT (REVISED) OF FOREIGN RELATIONS § 453 comment b (Tent. Final Draft 1985) ("purpose for which ... services are to be used—even if a public or governmental purpose—does not alter the commercial character of the activity"); Sornarajah, *Problems in Applying the Restrictive Theory of Sovereign Immunity*, 31 INT'L & COMP. L.Q. 661, 664–65 (1982). This congressional expectation would not be fulfilled were we to sanction a tail-wagging-dog approach to the goods or service purchasing contracts of foreign sovereigns.

We note that AID required Bolivia to exempt "[a]ny foreign contractor" and "any property or transaction" relating to the agreement and the grant to Bolivia from "taxes, tariffs, duties or other levies." R.E. O, Annex 2, § B.4(b)(1).[16] The district court's approach would yield immunity for foreign states whenever AID conditioned its financial support on performance-facilitating features of the kind encountered here.[17] Congress, however, did not intend the AID connection to turn an otherwise commercial venture into a governmental one or vice versa. *See* H.REP. No. 1487,

---

**13.** The House and Senate reports are substantially identical. *See* S. REP. No. 1310, 94th Cong., 2d Sess. (1976).

**14.** At oral argument, counsel for PCI stated that "this is a cost-reimbursement contract" under which PCI would recoup any taxes it paid.

**15.** Government benefits, for example, special tax incentives for investors, might be at the core of some contracts. *Cf. Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1110 n. 6 (S.D.N.Y.1982) (hypothesizing such a case). We express no opinion on a venture of that order.

**16.** The provision in full reads:
Any foreign contractor, including any consulting firm, any personnel of such contractor financed under the Grant, and any property or transaction relating directly to such contracts and any commodity procurement transaction financed under the Grant, are exempt from identifiable taxes, tariffs, duties or other levies imposed under laws in effect in Bolivia. R.E. O, Annex 2, § B.4.(b)(1).

**17.** In at least one situation, an AID regulation mandates tax and duty exemptions; agricultural commodities transferred to foreign governments under Title II of the Agricultural Trade Development and Assistance Act of 1954, codified in part as amended at 7 U.S.C. §§ 1721–1724, "shall be admitted duty free and exempt from all taxes." 22 C.F.R. § 211.7(b) (1986), regulation cited in *Transamerican Steamship Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1005 (D.C.Cir.1985) (Wald, J., concurring in part and concurring in the judgment).

*supra* p. 1550 at 16, 1976 U.S. CODE CONG. & ADMIN.NEWS at 6615.[18]

AID finances two types of contracts relating to development projects in foreign countries: "direct" contracts in which AID is itself a party to the contract; and "host country" contracts in which the contracting parties are host government and contractor, with AID participating only as the financing entity. The PCI–Bolivia contract is of the latter type, although it "appears to be an amalgam of provisions normally found in both types of AID-financed contracts." Brief for the United States as Amicus Curiae at 8. PCI's technical assistance and consulting services have not been described to us as in any way uncommon or uncommercial, and the contract at issue, we are informed, "is not unusual." *Id.*

■ Having rejected the district court's reasons for holding the contract "governmental," and finding no substantial basis to categorize the activity in question as some-thing other than "commercial," we are unable to sustain the district court's judgment dismissing the action. *Cf. MacArthur Area Citizens Ass'n v. Republic of Peru,* 809 F.2d 918, 920 & n. 2 (D.C.Cir. 1987) ("operation of a chancery is, by its *nature,* ... governmental, not commercial"). However, we believe the district court should have the opportunity to consider, in the first instance, whether any of the other pleas raised by Bolivia merit continued vacation of the default judgment. We remand the case for that purpose.[19]

In doing so, we are mindful of Bolivia's claim that its failure to defend prior to PCI's attempt to enforce the default judgment "was the excusable result of 'a broad divergence in [American and Bolivian] cultural, governmental, and political approaches to the present case.'" *Practical Concepts, Inc.,* 613 F.Supp. at 865 n. 1.[20] We are also aware that it is in

18. The relevant passage reads:
By contrast, a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute a commercial activity. By the same token, a foreign state's activities in and "contacts" with the United States resulting from or necessitated by participation in such a program would not in themselves constitute a sufficient commercial nexus with the United States so as to give rise to jurisdiction (see sec. 1330) or to assets which could be subjected to attachment or execution with respect to unrelated commercial transactions (see sec. 1610(b)). However, a transaction to obtain goods or services from private parties would not lose its otherwise commercial character because it was entered into in connection with an AID program. Also public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel, but not the employment of American citizens or third country nationals by the foreign state in the United States.
H.REP. No. 1487, *supra* p. 1550, at 16, 1976 U.S.CODE CONG. & ADMIN.NEWS at 6615. *See also* 2 RESTATEMENT (REVISED) OF FOREIGN RELATIONS, *supra* note 11, § 453 reporters' note 2 (nature of activity, *e.g.,* purchase contract, not its purpose, *e.g.,* providing food for the needy, determines whether activity is commercial).

19. Foreign sovereigns unfamiliar with the United States judicial system may fail to compre-hend accurately what the FSIA means and how it operates. Intolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and "undermine the State Department's continuing efforts to encourage ... foreign sovereigns generally[ ] to resolve disputes within the United States' legal framework." Brief for the United States as Amicus Curiae at 13–15.

20. We are obliged to observe, as the district court did, that "the adversarial model of equally capable counsel and equally vigorous argument ... has not prevailed in this case." *Practical Concepts, Inc.,* 615 F.Supp. at 93 n. 1. Appellee's brief on appeal, we note, largely copied, verbatim, the district court's opinion. Of 22 argument pages, 15 repeat, without any variation in order or elaboration, the words of the district judge.
The principal original contribution appellee's brief presents is the frivolous contention that a Claims Court stipulated judgment, recording the out-of-court settlement of PCI's claim against AID, is somehow issue preclusive in the instant action. *See* Brief of Appellee at 21–22. No issue at all was "litigated and actually adjudged" in the Claims Court. Moreover, the two cases, one involving the obligation of the United States and the other, the undertaking of Bolivia, never even raised the "same" dispositive issue. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27 comment e at 257 (1982) (when judgment entered by "confession, consent, or default" rule of issue preclusion does not apply to any issue in a subsequent action).

the interest of United States' foreign policy to encourage foreign states to appear before our courts in cases brought under the FSIA. When a defendant foreign state has appeared and asserts legal defenses, albeit after a default judgment has been entered, it is important that those defenses be considered carefully and, if possible, that the dispute be resolved on the basis of of all relevant legal arguments.

Brief for the United States as Amicus Curiae at 3–4; *see Jackson v. People's Republic of China,* 794 F.2d 1490, 1491–97 (11th Cir.1986), *aff'g* 596 F.Supp. 386, 387 (N.D. Ala.1984) (because of foreign policy ramifications, public interest dictates that default judgment be set aside).[21] Finally, we have given "due weight ... to the United States' policy strongly favoring arbitration of international disputes." Brief for the United States as Amicus Curiae at 4, citing *Mitsu-*

*bishi Motors Corp. v. Soler Chrysler-Plymouth,* 473 U.S. 614, 105 S.Ct. 3346, 3356–57, 87 L.Ed.2d 444 (1985).

### CONCLUSION

For the reasons stated, we hold that the district court properly entertained the motion to set aside the default judgment, but incorrectly dismissed the action as barred by the FSIA. We vacate the judgment dismissing the action, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

---

**21.** PCI correctly reminds us that "one of the principal purposes of the FSIA was to transfer responsibility [from the Executive] to the courts for making determinations relating to a foreign sovereign's susceptibility to jurisdiction in the United States courts." Supplemental Brief of Appellant at 8–9. But the Act's intent to deprive the Executive of a conclusive say in this area does not mean that the Executive is to avoid any role in the adjudicatory process. *See* Letter

from the Legal Adviser of the State Department to the Attorney General (Nov. 10, 1976), 75 Dep't St. Bull. 649–50 (1976):

> ... the Executive Branch will, of course, play the same role in sovereign immunity cases that it does in other types of litigation—e.g., appearing as *amicus curiae* in cases of significant interest to the Government.