United States Court of Appeals,

Fifth Circuit.

No. 95-50161.

MCI TELECOMMUNICATIONS CORPORATION, Plaintiff-Appellee,

v.

Subhi ALHADHOOD, Captain, et al., Defendants.

The Ministry of Defense of the United Arab Emirates and State of the United Arab Emirates, Defendants-Appellants.

May 13, 1996.

Appeal from the United States District Court for the Western District of Texas.

Before HIGGINBOTHAM, EMILIO M. GARZA and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Defendants-Appellants appeal the district court's order denying their motion to vacate default judgment on the basis of their sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"). The district court found that Defendants-Appellants made promises to Plaintiff-Appellee MCI Telecommunications Corporation ("MCI") that qualified as commercial activity under the commercial activity exception of the FSIA, 28 U.S.C. § 1605(a)(2) because private parties would normally make such promises while participating in the market. We reverse based on our finding that the actions of Defendants-Appellants did not constitute commercial activity under the FSIA.

I. BACKGROUND

On September 26, 1986, Defendant-Appellant United Arab Emirates ("UAE") entered into an agreement/contract with the United

1

States Department of Defense for the training of UAE military personnel ("Student Battalion") under the sponsorship of the U.S. Army at Fort Bliss, Texas.  Note 5 of the agreement addressed the expenses covered by the Student Battalion:

> Students will be responsible for payment of charges for transportation, meals, laundry service, and any other services or personal living expenses they incur.  Purchaser agrees to ensure prompt payment for such expenses.

In August 1987, MCI instituted an investigation of unauthorized and unbillable calling activity reported by MCI's Richardson, Texas office.  Through its investigation, MCI established that, beginning approximately October 1986, in excess of $1 million in telephone calls using unauthorized codes and dial-up numbers were placed by members of the Student Battalion to the UAE and other overseas locations.

MCI contends that it first attempted to recover its damages through diplomatic channels by meeting with UAE Ambassador Ahmed Salim Al Mokarrab and UAE Military Attache Colonel Mubarak Rashid Al Ghafli at the UAE Embassy in Washington, D.C. on January 6, 1988.  MCI asserts that at that meeting Ambassador Mokarrab explicitly told representatives of MCI that if the unauthorized calls were attributable to the Student Battalion the UAE would assume responsibility and pay MCI their damages.  MCI contends that the Ambassador requested that MCI take no further legal action, but instead forward information to him on MCI's investigation.

MCI contends that it took no further legal action in reliance

2

on the Ambassador's statements at the January 6, 1988 meeting.[1] Throughout the early part of 1988, MCI forwarded detailed information regarding the members of the Student Battalion allegedly involved in the unauthorized telephone activity. MCI claims that Ambassador Mokarrab repeatedly delayed any further meetings until July 6, 1988, when Colonel Mubarak stated that he would not assist MCI because MCI failed to prove that any individual Student Battalion member made any of the unauthorized calls. MCI also contends that at that same meeting Ambassador Mokarrab stated that he had never promised MCI compensation. Then in August 1988, the UAE officially informed MCI that it would not compensate MCI for any of the telephone calls.

On May 11, 1989, MCI filed a complaint against the UAE, the UAE Ministry of Defense ("Ministry") and the individual members of the Student Battalion identified as having made the unauthorized calls. Service was obtained upon the UAE and the Ministry only.[2] One of the individual members of the Student Battalion filed an answer, but neither the UAE or the Ministry filed an answer. Because neither the UAE nor the Ministry answered or responded within the required time, default judgments were entered against the Ministry on November 8, 1989 and against the UAE on January 8,

---

[1]Five years later, Ambassador Mokarrab executed an affidavit denying that he made any promises to pay MCI for the unauthorized telephone calls.

[2]All the individual defendants were later dismissed.

1990.[3]

On May 21, 1993, the UAE and the Ministry moved to vacate the default judgments on the ground that they are immune from suit under the FSIA. The district court entered an order on February 10, 1995 denying the motion, finding that the UAE and the Ministry were not able to assert sovereign immunity for the unauthorized calls because the promises made by Ambassador Mokarrab and Colonel Mubarak to MCI to pay for the calls qualified as "commercial activity" under that exception to the FSIA. Both the UAE and the Ministry now appeal.

## II. JURISDICTION

This appeal arises from a denial of a motion to vacate default judgments entered against Defendants-Appellants. Separate default judgments were entered against the Ministry on November 8, 1989 and against the UAE on January 8, 1990. Defendants-Appellants filed their motion to vacate on May 21, 1993, more than three years after the last default judgment was entered. In their motion to vacate the default judgments, Defendants-Appellants claimed immunity from suit under the FSIA, and the district court denied the motion based on its finding that their actions fell under the "commercial activity exception to the FSIA. Immediate appeal, under the collateral order doctrine, is permitted from an order

---

[3]Prior to entering default judgments against the UAE and the Ministry, the district court held a hearing at which MCI presented evidence as to the amount of damages suffered and expenses incurred by MCI. MCI also filed a memorandum of law in support of its motion for default judgment on the issue of immunity under the FSIA at the court's request.

denying sovereign immunity under the FSIA because it raises the issue of the court's subject matter jurisdiction. *Stena Rederi AB v. Comision de Contratos,* 923 F.2d 380, 385 (5th Cir.1991). However, the question raised from the appeal in the instant case is whether entry of default judgment prior to Defendants-Appellants claim of sovereign immunity under the FSIA waives their right to claim immunity or challenge the default judgment entered by the district court on the same ground.

This Court has held in the context of the FSIA that

> [w]hen a defendant foreign state has appeared and asserts legal defenses, albeit after a default judgment has been entered, it is important that those defenses be considered carefully and, if possible, that the dispute be resolved on the basis of all relevant legal argument.

*Hester Intern'tl Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 175 (5th Cir.1989) (quoting *Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1552 (D.C.Cir.1987)). A claim of sovereign immunity under the FSIA is waived only when the sovereign/state fails to assert immunity in a responsive pleading. *See Rodriguez v. Transnave Inc.,* 8 F.3d 284, 287 (5th Cir.1993); *Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990). Thus, a waiver of sovereign immunity cannot be implied from a foreign state's failure to appear. Such a waiver would be inconsistent with section 1608(e) of the FSIA, which requires the court to satisfy itself that jurisdiction exists prior to entering a default judgment.[4] "[E]ven if the foreign state does

---

[4]Section 1608(e) provides in pertinent part:

No judgment by default shall be entered by a court of

5

not enter an appearance to assert an immunity defense, a district court still must determine that immunity is unavailable under the Act." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493-94 n. 20, 103 S.Ct. 1962, 1971 n. 20, 76 L.Ed.2d 81 (1983).

Neither does the FSIA or its legislative history state when sovereign immunity must be raised. The D.C. Circuit has concluded that a foreign state's failure to appear, even after default judgment has been entered, does not constitute a waiver. *Practical Concepts,* 811 F.2d at 1547. In *Practical Concepts,* the Court states that a defendant sovereign state that believes the district court lacks jurisdiction may choose one of two paths: it may appear, raise the jurisdictional objection, and ultimately pursue it on direct appeal; or it may challenge the court's jurisdiction in a collateral proceeding by refraining from appearing, thereby exposing itself to the risk of a default judgment, and asserting the jurisdictional objection when enforcement of the default judgment is attempted. *Id. See also Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 706, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding."). By deferring its jurisdictional

_____

the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.

28 U.S.C. § 1608(e).

6

challenge, the foreign state only loses its right to defend on the merits. *Id.* In the instant case, Defendants-Appellants did not file a responsive pleading prior to entry of default judgment; they elected to wait and see if a default judgment would be entered against them. Defendants-Appellants then asserted their claim of sovereign immunity in a collateral proceeding through a motion to vacate the default judgments. Although their appearance might otherwise be characterized as "untimely," we cannot infer a waiver of immunity from Defendants-Appellants' much delayed appearance in this case.

### III. COMMERCIAL ACTIVITY EXCEPTION TO THE FSIA

"We review the district court's conclusions about sovereign immunity *de novo*." *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines,* 965 F.2d 1375, 1383 (5th Cir.1992) (citing *Stena,* 923 F.2d at 386). The FSIA provides foreign states immunity from suit in federal and state courts unless a specified exception applies. 28 U.S.C. § 1604. One such exception, "commercial activity," is defined under the Act as "either a regular course of commercial conduct or a particular transaction or act." 28 U.S.C. § 1603(d). "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id. See also Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992). We have stated "that an activity has a commercial nature for purposes of FSIA immunity if it "is of a type that a private person

7

would customarily engage in for profit.' " *Walter Fuller,* 965 F.2d at 1384 (5th Cir.1992) (quoting *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1108 n. 6 (5th Cir.1985)).[5]

A. *Promises to Pay*

Defendants-Appellants contend that their alleged promises to pay MCI for the unauthorized calls did not make them private players within the market, as defined by the U.S. Supreme Court in *Weltover,* because the non-commercial activity of stealing telephone services did not create a "market" to which their alleged promises could relate.  On the other hand, MCI asserts that Defendants-Appellants' promises to pay were made in the context of their attempt to resolve a private dispute, which is exactly the type of activity in which private parties engage.  *See United States v. Moats,* 961 F.2d 1198, 1205 (5th Cir.1992) ("[t]he negotiation of contracts, including entry into a settlement agreement, clearly is the type of act performed by private persons").  Thus, MCI argues, the Defendants-Appellants' express promises to pay constituted "commercial activity" within the meaning of § 1605(a)(2).

We find that alleged promises made through diplomatic channels do not constitute commercial activity.  As we stated in *Walter Fuller,* "courts typically hold that contracts for the procurement of goods and services are commercial rather than

---

[5]This approach has been approved by the U.S. Supreme Court in *Weltover,* 504 U.S. at 614, 112 S.Ct. at 2166 ("the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce' ").

governmental in nature." 965 F.2d at 1384 (internal citations omitted). Negotiations over the payment of illegal telephone calls, however, are not commercial in nature. Private parties may engage in talks, negotiations, and may even make promises to resolve disputes, but not all such activity will be deemed "commercial." *See Rush-Presbyterian-St. Luke's Medical Center v. Hellenic Republic,* 877 F.2d 574, 578-79 (7th Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989). MCI approached Defendants-Appellants not to form a contract for goods or services, but to try and recover its losses from the unauthorized use of its services by third parties. Thus, we find no nexus between MCI and Defendants-Appellants sufficient to find a contract or agreement that would be "commercial" in nature so to constitute commercial activity. In addition, any attempt to resolve the dispute related to services provided to third parties, and not Defendants-Appellants in this instance, and are clothed with a diplomatic nature, not a commercial one.[6]

B. *Contract for Personal Living Expenses*

Addressed as an alternative argument for affirming the district court's judgment, MCI contends that Note 5 of the military training agreement between the UAE and the United States expressly makes the UAE a guarantor of the payment of personal expenses

---

[6]In this regard we note that MCI admits that instead of filing criminal charges against the Student Battalion members who made the unauthorized calls, it sought to recover its losses through "diplomatic channels" at the UAE Embassy. The negotiations were not related to any contract for services between the UAE and MCI, as no such contract was ever in existence.

9

incurred by the Student Battalion.  MCI argues that by agreeing to act as a guarantor for debts incurred by the Student Battalion, which includes telephone calls, the UAE is, like a private party, engaging in commercial activity.  Relying on *Weltover,* MCI asserts that the agreement constitutes commercial activity not for its "purpose," but by its "nature";  although the agreement has a governmental purpose, the guarantee contained in Note 5 constitutes commercial activity.  *See Weltover,* 504 U.S. at 614, 112 S.Ct. at 2166.  MCI also argues that the guaranty in Note 5 is unambiguously written without any limitation for the benefit of all creditors providing services of a personal nature to the Student Battalion. Thus, under Texas law, MCI claims itself as a third-party beneficiary under the agreement.[7]  We find no merit in MCI's arguments.

The cases relied on by MCI are inapplicable in that they involve contracts or agreements between a sovereign state and the complaining party for either the sale of goods or services.[8]  The contract in this case involves a military training agreement between two sovereign parties, the United States and the UAE.  No goods or services were purchased or required to be purchased from MCI under the terms of the contract.  Therefore, we find nothing in the nature of this agreement, even considering the provisions of

---

[7]*See United States v. Allstate Ins. Co.,* 910 F.2d 1281, 1284 (5th Cir.1990) (citing *Hermann Hosp. v. Liberty Life Assurance Co. of Boston,* 696 S.W.2d 37 (Tex.App.—Hous.1985, error refused n.r.e.)).

[8]*See Hellenic Republic, supra;  Gemini Shipping v. Foreign Trade Org.,* 647 F.2d 317 (2d Cir.1981).

Note 5, that would constitute commercial activity.

C. *Unauthorized Telephone Calls*

As a second alternative argument, MCI contends that because the procuring of telephone services is a basic activity undertaken by private persons on a daily basis, the placing of long distance telephone calls by members of the Student Battalion constitutes "commercial activity" within the meaning of the FSIA.  MCI argues that each use of MCI's authorization codes created federal tariff obligations on the caller to pay MCI for the long distance telephone services procured, and such activity is commercial, even in the context of an implied rather than express contract.  MCI asserts that this argument is even stronger in the instant case because the implied agreement to pay MCI for its provision of tariffed telephone services is not permeated by any overriding governmental function or purpose.

We find no merit in MCI's contentions.  At first glance, this argument appears as an attempt to apply the "tortious activities" exception to the FSIA, since it involves the actions of the UAE's "employees" (*i.e.,* the Student Battalion).[9]  Clearly, the making of

_____

[9]The "tortious activities" exception provides in pertinent part:

> (a) A foreign state shall not be immune form the jurisdiction of courts of the United States or of the States in any case—

> (5) ... in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his

11

unauthorized long distance telephone is not within the Student Battalion's scope of employment. *See Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 173 (5th Cir.1994). Even if we were to attempt to apply the commercial activity exception, the nature of the calls, which are stolen, could not be found to be "commercial."

IV. CONCLUSION

Finding Defendants-Appellants actions did not constitute "commercial activity" so that Defendants-Appellants are entitled to immunity from suit under the FSIA, we VACATE the default judgment of the district court and DISMISS the case for lack of subject matter jurisdiction.

EMILIO M. GARZA, Circuit Judge, dissenting:

The majority in Part III.A. holds that UAE's actions—"its promises to pay"—did not constitute "commercial activity" under the commercial activity exception of the FSIA, 28 U.S.C. § 1605(a)(2). Because I believe that UAE and MCI's alleged contract negotiations constituted "commercial activity" under the FSIA, I dissent.[1]

My disagreement with the majority opinion begins with its failure to address the burden of proof. Under the FSIA, "[o]nce the defendant alleges that it is a "foreign state', the plaintiff must produce some facts to show that the commercial activity exception to immunity applies, but the defendant retains the

---

office or employment....

28 U.S.C. § 1605(a)(5).

[1]I concur in Part II and Parts III.B. and C. of the majority opinion.

12

ultimate burden of proof on immunity." *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 533 (5th Cir.), *cert. denied,* 506 U.S. 956, 113 S.Ct. 413, 121 L.Ed.2d 337 (1992). In this case, UAE has the burden of proving that it is immune from suit under the FSIA. However, instead of analyzing whether UAE has met this burden, the majority opinion focuses solely on discrediting MCI's arguments.

"The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992). The Court in *Weltover* emphasized that the "commercial activity" exception to the FSIA embodies the restrictive rather than the absolute view of foreign sovereign immunity. *Id.* at 613, 112 S.Ct. at 2165. Pursuant to this restrictive theory, the Court held that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial' within the meaning of the FSIA." *Id.* at 614, 112 S.Ct. at 2166. The determinative factor is not whether the foreign government is acting to fulfill uniquely sovereign objectives. "Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce.' " *Id.* (quoting Black's Law Dictionary 270 (6th ed. 1990)).

Applying this rule, the *Weltover* Court held that Argentina had

13

"participated in the bond market in the manner of a private actor," and therefore engaged in a "commercial activity," when it issued bonds to restructure debt. *Id.* at 615-19, 112 S.Ct. at 2167-68. Focusing on the nature of the Argentine government's behavior, not its purpose, the Court rejected the argument that the context in which the Argentine government created the bonds—to fulfill its obligations under a foreign exchange program designed to address a domestic credit crisis and to control the nation's critical shortage of foreign exchange—made these bonds "sovereign" instead of "commercial" in nature. *Id.* at 615, 112 S.Ct. at 2167. The Court stated that "it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." *Id.*[2]

Because the focus is on the nature of the foreign sovereign's behavior, most contracts entered into by a foreign sovereign will fall within the commercial activity exception.[3] We have previously noted the commercial nature of the making or breaching of a

---

[2]Applying *Weltover,* the Court in *Saudi Arabia v. Nelson,* 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) stressed that a state engages in commercial activity only when it exercises powers that can also be exercised by private citizens, as distinct from those powers that are peculiar to sovereigns. *Id.* at 360, 113 S.Ct. at 1479. Applying this logic, the Court held that Saudi Arabia's alleged wrongful arrest, imprisonment and torture of the plaintiff constituted an abuse of the state's police power, the exercise of which is "peculiarly sovereign in nature." *Id.*

[3]The legislative history of the FSIA specifically states that "a single contract, if of the same character as a contract which might be made by a private person," is an example of the type of behavior that the "commercial activity" exception was designed to encompass. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 16 (1976), U.S.C.C.A.N.1976, at 6615.

14

contract.  *See Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines,* 965 F.2d 1375, 1386 (5th Cir.1992) (holding that the breach of a contract for the sale of aircraft is a commercial activity);  *United States v. Moats,* 961 F.2d 1198, 1205 (5th Cir.1992) ("The negotiation of contracts, including entry into a settlement agreement, clearly is the type of act performed by private persons.");  *Stena Rederi AB v. Comision de Contratos del Comite,* 923 F.2d 380, 389 n. 11 (5th Cir.1991) ("A single contract or course of dealing executed within this nation's boundaries typically will constitute commercial activity carried on in the United States.").

Other circuits have also noted that a foreign government's formation or breach of a contract will typically constitute commercial activity.  In *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Rep.,* 877 F.2d 574 (7th Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989), the Seventh Circuit stated that although "contracts for purchase or sale of goods or services are presumptively "commercial activities,' ... certain contracts, although generally of a type in which a private person could enter, are by their nature governmental, since only a sovereign entity deals in the particular kind of goods or services."  877 F.2d at 578.  Examples of noncommercial contracts that the court cited included a contract to allow a private party a license to exploit the state's natural resources and employment contracts between a state and its civil servants or military personnel.  *Id.* at 578-79.  In *Janini v. Kuwait University,* 43 F.3d 1534, 1537 (D.C.Cir.1995),

15

the D.C. Circuit held that the Kuwait University's unilateral termination of employment contracts was a commercial activity, despite the fact that it was accomplished by a formal decree of abrogation as the result of the Iraqi invasion of Kuwait.

In this case, there is nothing sovereign about UAE's behavior—the alleged making and breaching of a contract with MCI. This is simply a contract for services which UAE felt it was morally obligated to enter into. The fact that the telephone calls were unauthorized, or that UAE had a military training agreement with the United States is irrelevant to the nature of UAE's actions. UAE's actions were not authorized by a power peculiar to a foreign state; the making and breaching of this contract was not the result of UAE's exercise of its police powers or power over the state's resources, or even its power over the military. Instead, any private person could have engaged in these actions.

For the foregoing reasons, I respectfully dissent from the majority opinion, and I would hold that UAE's alleged making and breaching of a contract with MCI constituted "commercial activity" under 28 U.S.C. § 1605(a)(2).