United States Court of Appeals,

Fifth Circuit.

No. 91–1805.

WALTER FULLER AIRCRAFT SALES, INC., Plaintiff–Appellee,

v.

The REPUBLIC OF THE PHILLIPINES and the Phillipines Presidential Commission on Good Government, Defendants–Appellants.

June 29, 1992.

Appeal from the United States District Court for the Northern District of Texas.

Before KING and WIENER, Circuit Judges, and LAKE, District Judge.[*]

KING, Circuit Judge:

Shortly after the Marcos regime was ousted from the Phillipines, the new government of Corazon Aquino created the Presidential Commission on Good Government (PCGG) to recover any ill-gotten gains of Marcos and his confederates. Using its power to sequester property, the PCGG obtained control of a Falcon 50 jet aircraft (the Falcon) that had been leased by a Phillipine corporation with alleged ties to the former Marcos regime. The owner of the plane was Faysound, Ltd., a Hong Kong corporation. The PCGG ultimately sold the Falcon to an American corporation, Walter Fuller Aircraft Sales, Inc. (Fuller), which brought it to the United States. Faysound, distressed about the disposition of its property, brought an action against Fuller in federal district court in Arkansas to try title, and won.

This lawsuit arose out of the Arkansas proceedings. Fuller, claiming that the PCGG had promised in the deed of sale to defend any action brought by an adverse claimant to the Falcon, sued the PCGG and the Republic of the Phillipines (Republic) in the United States District Court for the Northern District of Texas in an effort to recover the cost of defending Faysound's lawsuit. The PCGG and the Republic moved to dismiss on the ground that they were entitled to sovereign

_____

[*]District Judge of the Southern District of Texas, sitting by designation.

immunity under the Foreign Sovereign Immunities Act (FSIA),[1] but the district court held that the suit could go forward against both defendants. We agree that the district court had subject matter jurisdiction over the suit against the PCGG under the commercial activities exception to the FSIA, but the record is insufficient to allow a determination of whether the Republic can be held liable for the acts of the PCGG under an agency theory. We also reject the defendants' argument that the act of state doctrine bars the suit, and hold that the district court had jurisdiction over a tort claim advanced by Fuller. We do not, however, accept the defendants' invitation to review the district court's ruling on the issue of forum non conveniens.

I.

On February 28, 1986, President Corazon Aquino signed Executive Order No. 1, creating the PCGG. The PCGG was charged with, *inter alia,* assisting in "[t]he recovery of all ill-gotten wealth accumulated by former President Ferdinand E. Marcos, his immediate family, relatives, subordinates and close associates, whether located in the Phillipines or abroad, including the takeover or sequestration of all business enterprises and entities owned or controlled by them...." In order to carry out this duty, the PCGG was given the power and authority "[t]o provisionally take over in the public interest or to prevent its disposal or dissipation, business enterprises and properties taken over by the government of the Marcos Administration or by entities or persons close to former President Marcos...." Two weeks later, by Executive Order No. 2, President Aquino froze and prohibited the transfer of all assets in which Marcos or any of his associates had any interest.

Using its power under Executive Orders Nos. 1 and 2, the PCGG issued a writ of sequestration against Eduardo Cojuangco, Jr., describing a Falcon 50 jet aircraft registered in the name of United Coconut Chemicals, Inc. (UNICHEM) as lessee. Cojuangco was a wealthy businessman with a substantial interest in UNICHEM, and had ties to former President Marcos. As

---

[1]Pub.L. 94–583, 90 Stat. 2891, *codified at* 28 U.S.C. §§ 1330; 1332(a)(2)–(4); 1391(f); 1441(d); 1602–1611.

required by Executive Order No. 14, the PCGG applied to the Sandiganbayan, the special Phillipine

court established to adjudicate claims to property sequestered by the PCGG, for permission to sell

the Falcon.  The Falcon began to deteriorate while the proceedings were pending, so the PCGG

stepped up its efforts to sell.  In late summer 1989, Fuller, a Texas corporation in the business of

aircraft brokerage and resale, began negotiations with the PCGG for the purchase of the Falcon.

Although the PCGG apparently never received permission from the Sandiganbayan to sell the plane,

it eventually closed the deal with Fuller.[2]  Fuller and the PCGG executed two agreements covering

the sale, a Deed of Sale and a Memorandum of Agreement.  The Deed of Sale provides as follows:

ARTICLE V. WARRANTIES AND REPRESENTATIONS

b. The SELLER ... does hereby assume full responsibility, to defend and hold harmless the
BUYER from any and all claims of all persons whosoever, including but not limited to
adverse claims, charges, liens, and/or possible encumbrances that may be place [sic] on the
title by reason of any act, contract or agreement entered into, prior to the date of this Deed
of Sale, as the SELLER by virtue of this sale, has released subject aircraft absolutely free from
any such claims, for if any there be should arise, such claims are understood ipso facto
directed against the proceeds of the sale that is deposited in escrow, and not anymore on the
aircraft.

After taking possession, Fuller transported the Falcon to Arkansas for repairs.

On October 9, 1989, Faysound, the Hong Kong corporation that owned the Falcon and had

leased it to UNICHEM, filed an action in the United States District Court for the Eastern District of

Arkansas against Fuller and Falcon Jet Corporation to try title to the aircraft (the Arkansas action).

Fuller notified the PCGG in writing of the Arkansas action and requested that it "defend and hold

[Fuller] harmless" from Faysound's claim of title to the aircraft.  The PCGG refused.  On October 29,

1990, the district court granted Faysound's motion for summary judgment, holding that the PCGG's

expropriation of the Falcon from an entity that did not own it was not protected by the act of state

---

[2]The events leading up to the PCGG's acquisition of authority to sell the aircraft, none of
which is relevant to this appeal, are intriguing and are commended to intrepid students of
international law and civil procedure. *See Faysound Ltd. v. Walter Fuller Aircraft Sales, Inc.,*
748 F.Supp. 1365, 1367–70 (E.D.Ark.1990), *appeal dismissed,* 940 F.2d 339 (8th Cir.1991) (per
curiam), *cert. denied,* ––– U.S. ––––, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992).

doctrine. *Faysound Ltd. v. Walter Fuller Aircraft Sales, Inc.,* 748 F.Supp. 1365 (E.D.Ark.1990), *appeal dismissed,* 940 F.2d 339 (8th Cir.1991) (per curiam), *cert. denied,* ––– U.S. ––––, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992). On November 21, 1990, Fuller again requested that the PCGG bear the costs of defending the Arkansas action. The PCGG again refused. On December 10, 1990, Fuller filed this action against the PCGG and the Republic for breach of the contractual indemnity clause, for breach of warranty of title, and for a declaration of the parties' rights under the Deed of Sale.

The PCGG and the Republic filed a joint motion to dismiss. They agreed that they were both foreign states as defined in the FSIA, but the Republic argued that it could not be held liable for the actions of its instrumentality, the PCGG. Moreover, they asserted, none of the exceptions to the FSIA's general rule of sovereign immunity, including the "commercial activities" exception, applied, so the district court lacked subject matter jurisdiction. Finally, they argued that the suit was barred by the act of state doctrine. In an order entered April 18, 1991, the district court denied the motion. It held, first, that under the analysis of *First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) [*Bancec* ], the Republic could be sued for the acts of the PCGG because the PCGG was the "alter ego" of the Republic. It then held that the FSIA did not shield the defendants from liability because (1) the Deed of Sale, although not containing an explicit choice of law provision, contemplates that disputes would be adjudicated in the United States, and therefore functions as an implicit waiver of sovereign immunity under 28 U.S.C. § 1605(a)(1) (exception for waiver of immunity); and (2) the contract between the PCGG and Fuller was commercial activity which produced a direct effect in the United States sufficient to support jurisdiction under 28 U.S.C. § 1605(a)(2) (exception for commercial activities). With respect to the commercial activities exception, the district court held that the PCGG had engaged in commercial activity because the aircraft contract was the type into which private parties enter. It also held that the contract amounted to commercial activity outside the United States with a "direct effect" in the United States, because the PCGG's alleged actions caused Fuller, an American corporation, to suffer a foreseeable financial loss. The court next determined that it had personal jurisdiction over the

defendants. Finally, the court determined that the act of state doctrine did not bar the suit because the sale of the Falcon either was not the act of a sovereign or involved repudiation of a commercial obligation.

In an amended complaint, Fuller added a claim for actual and punitive damages against the PCGG under a tort theory and alleged an exception to sovereign immunity under 28 U.S.C. § 1605(a)(5) (noncommercial tort exception). The defendants then filed a second motion to dismiss, adopting the arguments for dismissal asserted in their original motion and adding the additional defense of forum non conveniens.[3] In an order entered July 9, 1991, the district court determined that it had jurisdiction over Fuller's tort claim through the operation of 28 U.S.C. § 1367 (providing for "supplemental" jurisdiction over related claims whenever district courts have original jurisdiction in a civil action) and denied the forum non conveniens argument. With respect to the latter, the court held that the Phillipines would not be an adequate forum, that trial of the case would be easier in Texas, and that the public interests in the dispute weighed in favor of an American forum.

The defendants filed a timely notice of appeal after the district court's second decision.[4] On October 31, 1991, Fuller filed its appellate brief and a Motion to Dismiss Moot Appeal. In the motion, Fuller pointed out that the PCGG had recently filed a complaint in an adversary proceeding in the Bankruptcy Court for the Northern District of Texas against Faysound and Fuller. The bankruptcy complaint, which was attached to the motion, sought a declaration either that Fuller was the rightful owner of the Falcon, or, if Fuller was not the rightful owner, that the PCGG had an

---

[3]The amended complaint was filed before the district court's first order. The defendants had responded by filing their second motion to dismiss on April 12, six days before the first order was entered on the docket but two days after the order had been signed by Judge Buchmeyer. After the first order was issued, the defendants filed a notice of appeal. A panel of this court dismissed the appeal as premature because the district court had not yet ruled on the second motion to dismiss which contained the tort immunity claim.

[4]Immediate appeal, under the collateral order doctrine, is permitted from an order denying sovereign immunity under the FSIA. *Stena Rederi AB v. Comision de Contratos,* 923 F.2d 380, 385 (5th Cir.1991).

interest in the aircraft superior to that of Faysound.[5]  Fuller argued that this complaint functioned as a waiver of sovereign immunity because the bankruptcy court suit involved the transaction over the Falcon.  Fuller further argued that, because the PCGG was an agent of the Republic, the waiver extended to the Republic.  Thus, Fuller contended, the appeal was moot and this court should refrain from exercising its pendent appellate jurisdiction to decide any of the other issues.  The PCGG and the Republic opposed the motion.  On February 5, 1992, a panel of this court decided that Fuller's motion should be carried with the case.

On January 10, 1992, Fuller filed a motion to supplement the record with documents filed by the Republic in the bankruptcy action.  These documents included the Republic's motion to dismiss a third-party complaint which had been filed by Fuller in that action, and the attachments to that motion.[6]  One of the attachments was the Republic's complaint against Cojuangco in the Sandiganbayan.  Paragraph 17 of the complaint stated that Fuller was "the buyer of the [Falcon] from the plaintiff."  Fuller asserted in its motion to supplement that this complaint constituted a judicial admission of the Republic's status as seller of the airplane.  On February 5, this court granted Fuller's motion to supplement the record.

## II.

We must first decide whether to grant Fuller's motion to dismiss the appeal as moot.  Normally, an appeal becomes moot when, for whatever reason, there is no longer any case or controversy.  *See ITT Rayonier, Inc. v. United States,* 651 F.2d 343, 345 (5th Cir. Unit B 1981).  Fuller's motion, however, argues that mootness arises from a waiver of sovereign immunity which occurred after the district court's decision.  This is really an argument which goes to the substance of the waiver question.  Although Fuller may be arguing that the appeal is moot, it is simply pointing

---

[5]Counsel informed us at oral argument that the bankruptcy action has since been dismissed.

[6]The bankruptcy action had been filed only by the PCGG against Fuller.  Fuller impleaded the Republic.

to another reason why we should find a waiver of sovereign immunity. We need not address the merits of the waiver argument, however, because there is ample support for the district court's conclusion that the sale of the Falcon fell within the commercial activities exception to the FSIA (at least with respect to the PCGG). Thus, Fuller's motion is itself moot.

## III.

We next confront the district court's decision that the Republic could be held liable under an agency theory for the acts of the PCGG. The district court articulated two separate rationales for imputing liability to the Republic. First, the court observed that if the PCGG was not an agent of the Republic, it did not satisfy the definition of a "foreign state" under § 1603, and thus would not be entitled to a presumption of immunity. Later in its opinion, the court analyzed specific record evidence to conclude that there was an agency relationship. The court relied on (1) a letter from the PCGG to Fuller indicating that the PCGG had authority to sell on behalf of the government; (2) the fact that the proceeding to seize the Falcon in the Sandiganbayan was initiated in the name of the Republic; (3) the fact that the Republic filed a certiorari petition in the Phillipines Supreme Court in proceedings involving the propriety of the seizure and sale even though an action of the PCGG was at issue in the case. The court then turned to five factors suggested in *Bancec* for determining whether an instrumentality of a foreign government functions as the alter ego of the government.[7] The court pointed to the facts that the Phillipine government created and defined the mission of the PCGG, funds from the national treasury were set aside for the PCGG's expenditures, the PCGG is empowered to obtain the assistance of all governmental entities in carrying out its mission, and funds recovered by the PCGG would go to the Republic. Although in the court's opinion "the government does not control the PCGG's day-to-day activities," the level of interrelationship evidenced by the

---

[7]The district court distilled the following five factors from *Bancec:* (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations. The *Bancec* opinion does not, however, set forth these factors as part of a "test" for determining agency status.

above factors enabled the court to conclude that the Republic and the PCGG were jointly liable for the conduct of each other.

The district court's first rationale—the PCGG is a foreign state under the FSIA, so it is an agent for liability purposes—confuses two distinct issues. Section 1603 defines the universe of entities entitled to statutory sovereign immunity.[8] This is completely different from the question whether a foreign state and its agency or instrumentality are alter egos for purposes of substantive liability. *Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 176 n. 5 (5th Cir.1989). "[T]he level of state control required to establish an "alter ego' relationship is more extensive than that required to establish FSIA "agency.' " *Id.; see also Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 448 (D.C.Cir.1990). Thus, the mere fact that the PCGG fit within § 1603's definition of a foreign state does not bear on the issue here.

The district court's second rationale was derived from the correct legal standard, but we are not convinced that the court could determine alter ego status on the current state of the record. Instrumentalities of foreign governments are presumed to retain their separate juridical status, *Bancec,* 462 U.S. at 627, 103 S.Ct. at 2600, so the burden of proving an agency relationship which would enable Fuller to hold the Republic liable on a contract signed by the PCGG fell upon Fuller. *Hester,* 879 F.2d at 176; *De Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir.1984), *cert.*

---

[8]Section 1603 provides, in relevant part:

For purposes of this chapter—

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof....

*denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).  Cf. *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,* 959 F.2d 49 (5th Cir.1992).  *Bancec* remains the seminal case on the circumstances under which American courts may disregard the separate status of instrumentalities created by foreign governments.  In *Bancec* the Court held that, in a suit brought by Cuba's state-owned bank (Bancec) against Citibank to recover on a letter of credit, Citibank could assert a setoff against assets that had been expropriated by the Cuban government.  Although the Court recognized that legal respect for the separate nature of government instrumentalities is essential to "the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration," and found support for a presumption of separateness in the legislative history of the FSIA, 462 U.S. at 626, 103 S.Ct. at 2605, equitable principles drawn from corporate law required it to disregard the "corporate form."  Bancec was dissolved before Citibank asserted its setoff, the Court pointed out, so any benefit from disallowance of the setoff would accrue solely to the Government of Cuba.  *Id.* at 631–32, 103 S.Ct. at 2602.  The Court made clear, however, that it had not established any "mechanical formula" for evaluating efforts to disregard the separate status of government instrumentalities, but instead was relying on equitable principles applicable in particular to cases in which foreign governments seek to obtain the benefit of American courts.  *Id.* at 633, 103 S.Ct. at 2603.

The actual holding of *Bancec,* therefore, establishes only that a court must be sensitive to the extent to which the foreign government will be the real beneficiary of litigation.  The broader principles upon which *Bancec* was based—particularly the principle of disregarding the corporate form in instances where respecting it would lead to injustice—are undoubtedly relevant whenever a plaintiff seeks to disregard a foreign government instrumentality, but we perceive in the district court's opinion and the briefs of the parties an effort to create and apply the kind of mechanical formula the Supreme Court rejected.

Our precedent since *Bancec* indicates that, in addition to the equitable principles discussed

by the Supreme Court, we look to the ownership and management structure of the instrumentality, paying particularly close attention to whether the government is involved in day-to-day operations, as well as the extent to which the agent holds itself out to be acting on behalf of the government. *Hester,* 879 F.2d at 178, 181. In *Hester,* the plaintiff, an American corporation, brought suit against the Republic of Nigeria, a government-created corporation (NGPC), and one of the states of Nigeria, after a farming joint venture it had entered into with the NGPC and the state went sour. Hester appealed only the district court's dismissal, for lack of subject matter jurisdiction, of its breach of contract claim against Nigeria. Thus, the issue before this court was whether the district court had erred in refusing to disregard the separate status of the NGPC and Nigeria. After reviewing the *Bancec* principles, we cited with approval the decision in *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia,* 616 F.Supp. 660 (W.D.Mich.1985), in which the court focused on the fact that the government had assumed day-to-day operation of the instrumentality it owned.[9] *Hester,* 879 F.2d at 178. We determined that the issue was highly fact-bound, and so went on to review in detail the facts upon which the district court had based its conclusion.

Some of the relevant findings[10] were that Nigeria owned 100 percent of NGPC's stock; NGPC's employees were not Nigerian civil servants; no official of Nigeria was involved in negotiation of the contract; NGPC generated its own income from commercial and government loans; Nigeria exercised no voting rights in the joint venture set up by the contract; and documents

---

[9]In *Kalamazoo,*

> a government-owned corporation was no longer distinguishable as a separate entity when the majority of the instrumentality's stock had been expropriated, the government had required that all checks in excess of a certain amount be signed by a government-appointed director, a governmental agency was required to approve all invoices for shipments exceeding a certain amount, and the government generally exercised direct control over its operation.

*Hester,* 879 F.2d at 178.

[10]None of the findings were clearly erroneous. *Hester,* 879 F.2d at 180.

generated during the contract dispute showed that Nigeria considered NGPC entirely separate. In addition, documents reviewed by the district court showed that the Nigerian Federal Ministry of Agriculture exercised general supervisory control over the NGPC but was not involved in day-to-day operations. *Id.* at 179. We rejected Hester's contention that (1) documents which reflected the involvement of the Federal Ministries of Agriculture and Finance in obtaining a letter of credit for the project and (2) documents stating that NGPC "represents" Nigeria in pursuing agricultural policies revealed Nigeria's control. *Id.* at 180. In concluding that there was no alter ego relationship, we pointed out that Nigeria's ownership of 100 percent of NGPC stock and appointment of NGPC's Board of Directors was not dispositive,[11] and that the evidence did not reveal day-to-day control by the government. This conclusion was buttressed by analogizing to agency law: "[n]one of the documents prepared by Nigeria ever communicated that NGPC represented it beyond the extent that all corporate entities represent their shareholders." *Id.* at 181.

The Republic argues that its absence from the negotiations and from the contract to sell the Falcon immunizes it against liability. Fuller responds primarily by referring to the documents cited by the district court, and it has added additional documents in the supplemental record allegedly showing the Republic's involvement in the sale. We are not convinced, however, that the record in this case was sufficiently developed to enable the district court to make its findings. Neither the executive orders creating the PCGG (on which the district court relied) nor the documents filed by the Republic in the Sandiganbayan in connection with the seizure of the Falcon (the documents in the supplemental record), tell enough, by themselves, about the relationship between the Republic and the PCGG to allow a conclusion of alter ego status. All of these documents obviously have relevance to this issue, but they do not have the dispositive effect ascribed to them by the district court and Fuller. Significantly, the PCGG and the Republic have not had an opportunity to offer evidence about their relationship, as the district court made its determination solely from the documents submitted

---

[11]Other courts have recognized that 100 percent ownership of an instrumentality set up as a corporation is not dispositive. *Hercaire Int'l, Inc. v. Argentina,* 821 F.2d 559, 565 (11th Cir.1987); *Foremost–McKesson,* 905 F.2d at 448.

with the motion to dismiss. In the absence of an opportunity for the parties to flesh out the structure of their relationship, we are hesitant to rely solely on the original orders creating the PCGG and documents filed in the Supreme Court of the Phillipines. Unlike in *Hester,* this record does not contain the quantity or quality of evidence that would enable us to affirm or reverse the district court outright. Therefore, we must remand for further factfinding about the involvement of the Republic in the affairs of the PCGG. *See Foremost–McKesson,* 905 F.2d at 448 (remanding for further findings on principal-agency status); *cf. Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.) (district court may hear written and oral evidence in order to determine factual issues which determine jurisdiction), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Filus v. Lot Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir.1990) (plaintiff may engage in discovery with respect to jurisdictional issues under the FSIA).

IV.

The need for further factual development on the issue of the agency relationship between the PCGG and the Republic does not, however, affect our ability to review the district court's conclusions concerning the sovereign immunity of the PCGG. The PCGG signed the contract with Fuller and is a foreign state as defined in 28 U.S.C. § 1603. We therefore proceed to consider the applicability of the FSIA to the action against the PCGG.

We review the district court's conclusions about sovereign immunity *de novo. Stena Rederi AB v. Comision de Contratos,* 923 F.2d 380, 386 (5th Cir.1991). Under the FSIA, foreign states and their agencies and instrumentalities are immune from suit in the courts of the United States except as otherwise provided in the Act. 28 U.S.C. § 1604. A failure to satisfy the statute's exceptions deprives the district court of subject matter jurisdiction. *Stena,* 923 F.2d at 386; *Forsythe v. Saudi Arabian Airlines Corp.,* 885 F.2d 285, 288 (5th Cir.1989) (per curiam). The foreign state always has the burden of persuasion on immunity. Once the state makes a prima facie showing of immunity, the plaintiff seeking to litigate in the United States has the burden of coming forward with facts showing

that an exception applies. *Id.* at 289 n. 6.

Section 1605 contains the exceptions to sovereign immunity relevant in this case. It provides, in part:

> (a) A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;
>
> (2) in which the action is based upon a commercial activity carried on in the United States by a foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

We find that the § 1605(a)(2) exception (the commercial activities exception) applies in this case, and therefore do not discuss Fuller's argument about waiver.

In order for an American court to exercise jurisdiction over the PCGG under the commercial activities exception, Fuller's suit must be based upon "commercial activity" which has at least one of the three jurisdictional connections with the United States set forth in § 1605(a)(2). *Stena,* 923 F.2d at 386; *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1107 (5th Cir.1985). As we explained in *Stena,* "[n]ot only must there be a jurisdictional nexus between the United States and the commercial acts of the foreign sovereign, there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign." 923 F.2d at 386; *see also United States v. Moats,* 961 F.2d 1198, 1205–1206 (1992) ("*this lawsuit* must be based on commercial activities that are connected to the United States in the manner described by the statute") (emphasis in original); *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation,* 730 F.2d 195, 200 (5th Cir.1984); *America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 796 (9th Cir.1989).

1. Commercial Activity

The PCGG initially argues that the contract for the sale of the Falcon involved sovereign acts, not commercial activity. The statutory definition of "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Not surprisingly, courts faced with the question whether a particular act or series of acts constitutes commercial activity have ignored this circular definition and have, consistent with the intent of Congress, defined the concept on an evolving, case-by-case basis. *See* H.Rep. No. 94–1487, 94th Cong., 2d Sess. at 16, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6615 (federal courts are given "a great deal of latitude in determining what is a "commercial activity' under the FSIA"); *Segni v. Commercial Office of Spain,* 835 F.2d 160, 163 (7th Cir.1987).

Congress provided some guidance in the second sentence of § 1603(d), which directs us to look at the "nature" of an activity rather than its "purpose" in determining whether it is commercial. In *Callejo,* we adopted the view, first articulated in the landmark FSIA case of *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 309 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), that an activity has a commercial nature for purposes of FSIA immunity if it "is of a type that a private person would customarily engage in for profit." 764 F.2d at 1108 n. 6 (citations omitted).[12] Consistent with this definition, courts typically hold that contracts for the procurement of goods and services are commercial rather than governmental in nature. *See Texas Trading,* 647 F.2d at 310 (contract for purchase of cement is commercial); *Segni,* 835 F.2d at 164–65 (employment contract under which employee would market country's wines is commercial); *Rush–Presbyterian–St. Luke's Med. Center v. Hellenic Republic,* 877 F.2d 574, 581 (7th Cir.1989) (contract for purchase of medical services is commercial), *cert. denied,* 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989); *Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1550 (D.C.Cir.1987) (contract for developing rural areas is commercial).

---

[12]Numerous other courts have utilized the *Texas Trading* test. *See Rush–Presbyterian–St. Luke's Med. Center v. Hellenic Republic,* 877 F.2d 574, 578 n. 4 (7th Cir.1989) (collecting cases), *cert. denied,* 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989).

In addition, the House Report repeatedly mentions contracts for the purchase of goods in the course of describing activities that courts should consider commercial.

Employing the *Texas Trading* test, there is little doubt that the sale of the Falcon qualifies as commercial activity. The PCGG, however, argues that when we look to the broader activity behind the actual act of contracting, we will find that the contract was merely the end result of a truly governmental activity. Thus, it characterizes the relevant activity here as the recovery and sale of the ill-gotten gains of the Marcos regime, not the mere making (and alleged breach) of a contract to sell an airplane. It analogizes its acts to the kind of acts we held to be sovereign in *De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1393 (5th Cir.1985). In *De Sanchez,* the plaintiff sued to collect on a check issued by Banco Central, the Nicaraguan central bank. Banco Central had issued the check to enable the plaintiff to redeem a certificate of deposit she had purchased from another bank, Banco Nacional. This transaction was necessary because only Banco Central had the dollars necessary to redeem the CD. At about the time the check was issued, the Sandinistas came to power and the new government ordered that a series of checks, including the one made out to the plaintiff, not be honored. 770 F.2d at 1387–88. We held that Banco Central's action in issuing the check was sovereign, not commercial. We explained:

> By law, Banco Central had overall responsibility for the control and management of Nicaragua's monetary reserves ... It was permitted to sell foreign exchange only for certain limited purposes ... Banco Central became involved with Mrs. Sanchez only in its official role of regulating the sale of foreign exchange. Its only authorized purpose in issuing the check was to maintain stable exchange rates and to allocate scarce foreign exchange reserves among competing uses. Consequently, in the current context, characterizing Banco Central's action as a sale of dollars is not merely incomplete—it is incorrect.

*Id.* at 1393 (citation omitted). We acknowledged that ascertaining the nature of Banco Central's acts involved some inquiry into the purpose of the acts, but pointed out that the purpose "defined the conduct's nature ... [Banco Central] was performing one of its intrinsically governmental functions as the Nicaraguan Central Bank." *Id.* As the initial issuance of the check was governmental, so was the later breach. *Id.* at 1394.

We contrasted the situation in *Callejo,* where a private bank which later was nationalized, redeemed CDs in devalued foreign currency rather than in dollars in order to comply with new governmental exchange control regulations. The bank in *Callejo* merely complied with, rather than promulgated, the governmental policy, and thus its acts were deemed commercial. *De Sanchez,* 770 F.2d at 1394 n. 11. Similarly, we pointed out, in *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371 (5th Cir.1980), the defendant was subject to suit because it breached its contract to provide the plaintiffs with a tour package as a result of a separate governmental decision to deny the plaintiffs entry to the country. *De Sanchez,* 770 F.2d at 1394 n. 11.

*De Sanchez* represents the unusual case where it is extremely difficult to separate the "nature" and "purpose" inquiries. This case, by contrast, involves a run-of-the-mill contract which is in all respects indistinguishable from a contract entered into between two private entities to sell an airplane. We agree with the Seventh Circuit that we should, as far as possible, "confine any consideration of purpose as closely as we can, considering that purpose only so far as is absolutely necessary to define the nature of the act in question." *Segni,* 835 F.2d at 165. Whatever the conceptual or theoretical difficulties inherent in distinguishing between the "nature" and "purpose" of various commercial activity, only once, in *De Sanchez,* has this court found it necessary to look to the purpose of a transaction to assist it in determining whether the § 1605(a)(2) exception applies. The *De Sanchez* decision, however, involved commercial acts which represented the real-world manifestation of the "public" or "governmental" act of rationing the supply of foreign currency. Although issuing a check is the type of act that private entities perform innumerable times for profit, *see Callejo,* 764 F.2d at 1108 n. 6, private entities cannot and do not make policy decisions concerning the rationing of a country's remaining foreign currency reserves in the course of issuing checks. As the *De Sanchez* court explained, the mere issuance of the check was a governmental decision. 770 F.2d at 1393. Similarly, courts have found certain activities governmental rather than commercial for purposes of the FSIA even when they are identical to activities in which private parties engage. *See, e.g., MacArthur Area Citizens Ass'n v. Republic of Peru,* 809 F.2d 918 (D.C.Cir.) (country's remodelling

of chancery building is not commercial because operation of diplomatic buildings is sovereign activity), *modified on other grounds,* 823 F.2d 606 (D.C.Cir.1987).

Looking to the PCGG's mandate to recover Marcos's ill-gotten wealth as the defining aspect of this transaction would impermissibly involve us in an analysis of the purpose behind the transaction. The mere fact that we can draw a causal connection between the sovereign act and the commercial activity is irrelevant, for every contract into which a foreign sovereign enters theoretically can be traced to a public purpose. *Callejo,* 774 F.2d at 1109; *see also Rush–Presbyterian–St. Luke's,* 877 F.2d at 581. As directed by *Callejo,* we must look at the gravamen of the complaint. Here, it is the PCGG's refusal to defend according to a contractual obligation, not the sovereign act of recovering Marcos's wealth, that forms the basis for the suit.

Our conclusion that the PCGG's act of contracting was commercial rather than sovereign leads us to conclude further that the actual act upon which this suit is based—the breach of the contract—also was a commercial act. *See Callejo,* 764 F.2d at 1101 (selling of CDs and breach of obligation under it were both commercial acts); *Arango,* 621 F.2d at 1371 (selling of tour package and breach were both commercial acts). The nature of the initial contract perhaps is not necessarily dispositive on the question of breach; theoretically, the government itself could have ordered the PCGG not to defend Fuller in the Arkansas action as an act (or weapon) of foreign policy. *See Carey v. National Oil Corp.,* 453 F.Supp. 1097 (S.D.N.Y.1978) (country's inducement of breach of privately-made contracts was sovereign where done for foreign policy purposes), *aff'd on other grounds,* 592 F.2d 673 (2d Cir.1979). But there is no suggestion here that there were any public policy reasons behind the PCGG's refusal to abide by the Deed of Sale. The act of breaching thus is consistent with the original act of contracting: both were commercial activities.

2. Jurisdictional connection with the United States

The PCGG also challenges the required jurisdictional connection to the United States.

Focusing solely on the third clause of § 1605(a)(2), it asserts that the mere fortuity that Fuller lost money in the United States as a result of the alleged breach is not enough to satisfy this circuit's requirement that a breach of contract have a "substantial effect" in the United States as a "direct and foreseeable result" of conduct outside the United States. *Zernicek v. Brown & Root, Inc.,* 826 F.2d 415, 419 (5th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988). Even if it had reason to expect that Fuller would initially take the aircraft to the United States, the PCGG says, it was Fuller's unilateral decision to do so and Faysound's unilateral decision to bring suit to try title in the United States which caused the loss in the United States. These events, the PCGG argues, were not a foreseeable result of the contract; litigation in the Sandiganbayan was a more foreseeable occurrence.

The defendants' arguments are thoroughly unconvincing. While they are correct that a financial loss in the United States may not automatically qualify as a direct effect in this circuit, *Stena,* 923 F.2d at 390, it is clear that there was a "substantial" and "direct and foreseeable" effect in the United States, *id.* (citing *Zernicek,* 826 F.2d at 417–18), when Fuller was forced to assume a monetary risk that the defendants had contracted to assume. This case is not like *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511 (D.C.Cir.1988), on which the defendants rely heavily; there, the D.C. Circuit found no direct effect in the United States from a breach of a contract with an American engineer because the injury occurred abroad. *Id.* at 1514; *see also Zernicek,* 826 F.2d at 419 (personal injury to American citizen abroad is not a direct effect).

*Stena* and *Zernicek* require us to ask what losses were foreseeable from the PCGG's perspective. As Fuller argues, the Deed of Sale clearly contemplates that litigation could occur anywhere. In fact, litigation in the Sandiganbayan would be the *least* foreseeable because (1) that court only hears claims concerning title to seized property, and (2) it appears that only the PCGG has the authority to file actions in that court. Moreover, Fuller's "unilateral" decision to bring the Falcon to the United States, and thus to subject it to a title action here, is not relevant if the action was

foreseeable. It clearly was: the PCGG knew Fuller was an American corporation, it arranged for transport permits to the United States, executed an FAA Bill of Sale, and agreed to defend and indemnify Fuller anywhere litigation occurred. Accordingly, the third exception to § 1605(a)(2) is satisfied and the PCGG is not shielded by sovereign immunity.

## V.

The defendants also argue that the act of state doctrine bars this lawsuit. This doctrine limits, for prudential rather than jurisdictional reasons, the adjudication in American courts of the validity of a foreign sovereign's public acts. *See W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 404, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990); *Callejo,* 764 F.2d at 1113. As the invocation of an act of state defense does not call into question federal jurisdiction, the district court's ruling on the issue is not a part of the immediately appealable order denying sovereign immunity. In the exercise of our discretion and in the interest of judicial economy, however, we may consider claims under our pendent appellate jurisdiction that are closely related to the order properly before us. *Metlin v. Palastra,* 729 F.2d 353, 355 (5th Cir.1984); *see also Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1509 (11th Cir.1990); C. Wright, A. Miller, E. Cooper, E. Gressman, 16 *Federal Practice and Procedure* § 3937, at 269 (1977 & Supp.1992). Cf. *Myers v. Gilman Paper Co.,* 544 F.2d 837, 847 (5th Cir.1977) (related issues may be decided on appeal from order granting, denying, dissolving or modifying injunction). We exercise this power with caution, *Metlin,* 729 F.2d at 355, but here it is appropriate because the act of state issue is closely related to the issue of sovereign immunity.

The act of state doctrine serves to enhance the ability of the Executive Branch to engage in the conduct of foreign relations by preventing courts from judging foreign public acts. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). When determining whether the act of state doctrine limits adjudication in American courts, we look not only to the acts of the named defendants, "but [to] any governmental acts whose validity would

be called into question by adjudication of the suit." *Callejo,* 764 F.2d at 1113. The defendants assert that the act of state doctrine applies because resolution of this suit will call into question the Phillipine government's grant of power to the PCGG to sequester and sell assets, the PCGG's official acts of sequestering and selling the Falcon, the Phillipines Supreme Court's decision that the PCGG had no authority to sell the aircraft and that the proceeds of the sale should be placed in escrow until title is determined, and various other official acts. Furthermore, the defendants argue that, even if there is an exception to the act of state doctrine for the repudiation of commercial obligations, it is inapplicable here because the PCGG's commercial acts were traceable to sovereign acts.

We share none of the defendants' concerns about the effect of this lawsuit. The district court need not adjudicate the validity of any of the public acts authorizing the PCGG to sequester and sell assets in the course of determining whether the PCGG wrongfully repudiated its contractual obligation. Apart from the decision of the Phillipines Supreme Court, all of the public acts cited by the defendants directly involve the creation and extent of the PCGG's authority to acquire and convey title. This lawsuit, however, has nothing to do with title to the aircraft, but is instead a damages action arising from a contract breach. Unlike in *Callejo,* where the nationalized bank's breach of its obligation to the plaintiffs was required by a governmental edict concerning currency exchange rates, no act of state forced the PCGG to refuse to defend Fuller. Finding a breach in *Callejo* would have called into question the official acts which directly caused the breach. *Id.* at 1115–16. There is no comparable connection here between any public acts and the PCGG's refusal to defend.

Moreover, finding a breach here would not call into question the decision of the Phillipines Supreme Court, for that court has merely determined that the PCGG had no authority to sequester and sell the Falcon without permission from the Sandiganbayan. In short, all the public acts and decisions cited by the defendants may be valid and yet the PCGG still may have breached the contract. Although public acts lurk in the background, the act of state doctrine "does not preclude judicial resolution of all commercial consequences stemming from the occurrence of ... public acts." *Arango,*

621 F.2d at 1381.

VI.

The defendants next argue that the district court had no jurisdiction over Fuller's tort claim. Although the district court ruled on jurisdiction over Fuller's tort claim in an order separate from the order in which it held the commercial activities exception applicable, the second order also functioned as a denial of immunity. As such, it is immediately appealable under the collateral order doctrine.

The parties agree that the noncommercial tort exception to sovereign immunity, 28 U.S.C. § 1605(a)(5), is inapplicable. However, Fuller asserts that it can recover for tortious acts under the commercial activities exception of § 1605(a)(2). The defendants contend that Fuller is bound to the basis for jurisdiction over its tort claims which it originally pled (§ 1605(a)(5)) and that, because there is no jurisdiction under § 1605(a)(2) generally, there is no jurisdiction over the tort claim.

The defendants also argue that the district court erred in finding supplemental jurisdiction under 28 U.S.C. § 1367(a). That section, enacted ten days before Fuller filed its original complaint, provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....

Subsections (b) and (c) are not relevant here. However, the defendants argue, a federal statute, namely 28 U.S.C. § 1330(a), pro vides that the sole means of acquiring jurisdiction over a foreign sovereign is through operation of the FSIA. Thus, § 1367(a) is inapplicable.

We conclude t hat jurisdiction was properly exercised over Fuller's tort claim, at least with respect to the PCGG, under § 1605(a)(2). As discussed above, there is subject-matter jurisdiction

under § 1605(a)(2) to hear the claim against the PCGG because the PCGG engaged in commercial activity with a direct effect in the United States.  Section 1605 does not restrict the nature of the cause of action that may be asserted against a foreign sovereign over whom there is subject matter jurisdiction, but merely eliminates immunity "in any case ... in which the action is based upon" commercial activities.  Thus, because there is jurisdiction over the PCGG, the district court may resolve a tort claim which is based on the PCGG's commercial activity.[13]

We cannot affirm the order as to the Republic, however, because, as discussed above, further proceedings are necessary to determine whether the Republic can be held liable for the acts of the PCGG.  Thus, we will reverse this order insofar as it holds that the court has jurisdiction over Fuller's tort claim against the Republic, and remand for further proceedings.

VII.

Finally, the defendants quarrel with the district court's refusal to dismiss on grounds of forum non conveniens.  This order is not immediately appealable under the collateral order doctrine, however, as the need for an appellate court to examine factual and legal issues involved in the underlying dispute would often enmesh it too deeply in the merits of the action. *Van Cauwenberghe v. Biard,* 486 U.S. 517, 529, 108 S.Ct. 1945, 1953, 100 L.Ed.2d 517 (1988).

We do not think it appropriate to exercise our discretion to resolve this issue under our pendent appellate jurisdiction.  The factors to which we look in reviewing a district court's forum non conveniens decision are not closely related to the considerations involved in reviewing decisions concerning either sovereign immunity or the act of state doctrine.  The former requires us to examine,

---

[13]We note that the district court erred in applying 28 U.S.C. § 1347(a).  Title 28 U.S.Code § 1330(a) restricts suits against foreign sovereigns to those cases in which the sovereign is not entitled to immunity.  Under § 1604, immunity exists except as provided in §§ 1605–1607.  Thus, the exception contained in the first clause of § 1367(a) applies here.  Moreover, the intent of § 1367(a) was to codify the doctrines of pendent and ancillary jurisdiction.  H.R.Rep. No. 101–734, 101st Cong., 2d Sess., at 27–28, *reprinted in* 1990 U.S.Code Cong. & Admin.News 6802, 6873–6874; *see also* Siegel, Practice Commentary on § 1367 (in pocket part), at 219.

under a narrow standard of review, the district court's assessment of the most convenient place for trial. *See In re Aircrash Disaster Near New Orleans,* 821 F.2d 1147, 1162, 1166 (5th Cir.1987) (en banc), *vacated on other grounds sub nom. Pan American World Airways, Inc. v. Lopez,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989). As indicated in the opinion of the district court, the decision involves the weighing of a mix of private and public interests, keeping in mind that the plaintiff's choice of forum is usually to be respected. The private interests include ease of access to sources of proof; the availability of compulsory process for compelling attendance of unwilling witnesses; and the costs of obtaining the attendance of willing witnesses. *Id.* (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)). The public interests include the extent to which congestion will slow trial of the case; the interest in having controversies resolved in a local forum; the familiarity of the court with the governing law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.* at 1162–63. Of central importance in this case is the threshold question whether there exists an alternative forum. *See id.* at 1164; *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 265 n. 22, 70 L.Ed.2d 419 (1981).

As detailed above, the sovereign immunity issue in this case raised questions of the agency relationship between foreign governments and their instrumentalities, the characterization of certain acts as commercial or sovereign, and the effects of those acts in the United States. The act of state issue raised similar questions concerning the characterization of certain acts as public and sovereign or private and commercial. While the forum non conveniens issue may appear related in that it essentially involves a judgment as to whether this lawsuit should be heard in a court of the United States, that comparison is too general a basis for invoking a jurisdictional doctrine which is used only sparingly and with great caution. Sovereign immunity and the act of state doctrine represent expressions by the legislative and judicial branches of limits on suits against foreign sovereigns *as sovereigns.* Each has roots in the notion that our foreign policy interests are best served when courts exercise caution in extending their adjudicatory powers to foreign governments. *See Verlinden, B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486–89, 103 S.Ct. 1962, 1967–69, 76 L.Ed.2d 81 (1983)

(sovereign immunity); *W.S. Kirkpatrick,* 493 U.S. at 404, 110 S.Ct. at 704 (act of state doctrine). Forum non conveniens, on the other hand, deals with the more mundane matter of trial convenience and involves a balancing of interests totally unrelated to the conduct of foreign policy. We think it inappropriate to reach out and decide the forum non conveniens issue in a case in which our appellate jurisdiction is carefully defined by concerns about enforcing the immunity of foreign sovereigns from litigation.

VIII.

For the foregoing reasons, the order of the district court entered on April 18, 1991, is AFFIRMED as to the PCGG. This order is REVERSED as to the immunity of the Republic of the Phillipines, and the case is REMANDED to the district court for further proceedings consistent with this opinion. The order of the district court entered on July 9, 1991, is AFFIRMED as to Fuller's tort claim against the PCGG; REVERSED and REMANDED with respect to the Republic; and the defendants' appeal with respect to the forum non conveniens holding is DISMISSED without prejudice.